*Andreula v. Hometap Investment Partners III SPV, LLC, et al.*

# EXHIBIT A

Plaintiffs' First Amended Class Action Complaint, with Exhibits (filed October 6, 2026)

*Andreula v. Hometap Investment Partners III SPV, LLC, et al.,* Case No. 50-2026-CA-009134-XXXA-MB (Fla. 15th Jud. Cir. Ct., Palm Beach Cnty.)

Filing # 258585775 E-Filed 10/06/2026 11:49:06 AM

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA**

DOMINICK ADREULA and LESLIE ANDREULA,
on behalf of themselves and all others
similarly situated,

CASE NO.: 2026 CA 009134

Plaintiffs,

CLASS REPRESENTATION

v.

HOMETAP INVESTMENT PARTNERS III SPV, LLC,
HOMETAP EQUITY PARTNERS, LLC, and
HOMETAP HOMEOWNERSHIP SOLUTIONS, LLC,

Defendants.
_______________________________________/

**FIRST AMENDED CLASS ACTION COMPLAINT**

COME NOW the Plaintiffs, Dominick Andreula and Leslie Andreula, ("Plaintiffs"), individually and on behalf of a class of all persons or entities who are similarly situated, and, pursuant to Rule 1.190(a), Fla. R. Civ. P., file this First Amended Class Action Complaint against the Defendants, Hometap Investment Partners III SPV, LLC, Hometap Equity Partners, LLC, and Hometap Homeownership Solutions, LLC, (collectively, the "Defendants").

**INTRODUCTION**

1. This is a proposed class action brought by Plaintiffs and a class of those similarly situated against the Defendants to redress unjust, unfair, unconscionable, deceptive and usurious trade practices in the marketing and sale of the Defendants' "Home Equity Investment" products to Floridians which is a predatory scheme to disguise high-cost home loans as home equity "investments".

2. The Defendants' representations, omissions, and practices were deceptive, unfair, unconscionable and usurious and constitute a violation of the Florida Deceptive

and Unfair Trade Practices Act and Florida's statutory prohibitions on usury. Further, this case presents a prototypical situation for class treatment. The Defendants' complained of business practices are uniform among all customers. The application of Florida law to a shared course of conduct will determine liability for the class, ensuring that the rights of all impacted Floridians are vindicated through the efficiency of a single trial.

**PARTIES, JURISDICTION AND VENUE**

3. This Court has jurisdiction over this action and venue is proper in this Court. The Plaintiffs and putative class members are seeking damages, declaratory, and injunctive relief that meet the jurisdictional amount of this Court. The Plaintiffs are residents of Palm Beach County, Florida, and reside at 5344 Moon Shadow Lane, Greenacres, Florida 33463, which is the Plaintiffs' principal dwelling. The Plaintiffs' claims arise under Florida law.

4. Defendants, Hometap Equity Partners, LLC and Hometap Investment Partners III SPV, LLC, are Delaware limited liability companies with their principal place of business located at 75 Arlington Road, Suite 500, Boston, Massachusetts 02116 and regularly and routinely conduct business in the State of Florida and did so at all times material to the claims set forth herein.

5. Defendant Hometap Homeownership Solutions, LLC is a Delaware limited liability company with its principal place of business located at 361 Newbury Street, 5th Floor, Boston, Massachusetts 02115 and regularly and routinely conducts business in the State of Florida.

6. Upon information and belief, the Plaintiffs allege that at all relevant times, Defendant Hometap Investment Partners III SPV, LLC, was completely dominated and controlled by its Co-Defendant, Hometap Equity Partners, LLC, and was the alter ego of

Hometap Equity Partners, LLC. The Plaintiffs also allege that at all relevant times, each Hometap entity listed in paragraph 11, *infra*, was completely dominated and controlled by Defendant Hometap Equity Partners, LLC, and was the alter ego of Hometap Equity Partners, LLC. The Plaintiffs further allege that Defendant Hometap Homeownership Solutions, LLC, is completely dominated and controlled by its Co-Defendant, Hometap Equity Partners, LLC, and is the alter ego of Hometap Equity Partners, LLC.

7. Defendant Hometap Equity Partners, LLC, exercises control over and directs the actions of Defendant Hometap Investment Partners III SPV, LLC, Defendant Hometap Homeownership Solutions, LLC, as well as the Hometap entities set forth in paragraph 11, *infra*.

8. None of these Defendants or Hometap entities are licensed to make mortgage loans in Florida.

9. Defendant Hometap Equity Partners, LLC, Defendant Hometap Investment Partners III SPV, LLC, Defendant Hometap Homeownership Solutions, and the Hometap entities set forth in paragraph 11, *infra*, have contributed assets to a common undertaking, that is, the marketing and sale of "Home Equity Investment" products to real property owners in Florida by way of the Option Purchase Agreements at issue as alleged herein.

10. Defendant Hometap Equity Partners, LLC, Defendant Hometap Investment Partners III SPV, LLC, Defendant Hometap Homeownership Solutions, LLC, and the Hometap entities set forth in paragraph 11, *infra*, operate a common enterprise, share office space, personnel, marketing, form contracts, and a common client portal.

## **CLASS REPRESENTATION ALLEGATIONS**

11. Plaintiffs bring this action as a class action under Florida law and propose the following class initially defined to be: All persons who entered into an Option Purchase

Agreement, within the applicable statute of limitations for each of the class claims and extending through and up to the date of class certification, with any of the following entities: Hometap Equity Partners, LLC; Hometap Investment Partners III SPV, LLC; Hometap Equity SPV, LLC; Hometap Foundation Fund GP LLC; Hometap HEI Fund IV GP, LLC; Hometap HEI Fund IV SPV II, LLC; Hometap HEI Fund IV, L.P.; Hometap HEI Fund V, L.P.; Hometap HEI Fund VII, LP; Hometap Holdings II, LLC; Hometap Homeownership Solutions, LLC; Hometap Investment Partners II, L.P.; Hometap Foundation Fund LP; and Hometap Management Holdings, LLC, and any assignees of such entities, (collectively referred to herein as "Hometap"), where such Option Purchase Agreement was secured by real property located in Florida.

12. Excluded from the proposed class are Defendants, the Hometap entities set forth in paragraph 11, members of the immediate families of the officers and directors of Defendants or the Hometap entities set forth in paragraph 11, members of the judiciary, entities or individuals currently in bankruptcy, entities or individuals whose obligations have been discharged in bankruptcy, and governmental entities.

13. Plaintiff maintains the right to create additional classes or subclasses, if necessary, and to revise these definitions to maintain a cohesive class which does not require individual inquiry to determine liability.

14. The exact number of class members is unknown to Plaintiffs at this time, but such information can be ascertained through appropriate discovery, specifically from records maintained by Defendants. Upon information and belief, the number of putative members of the class is at least forty persons rendering joinder of individual class members impracticable.

## FACTUAL ALLEGATIONS

### A. Hometap Contracts.

15. Hometap contracts are lengthy, convoluted, and difficult for a lay person to understand.

16. Upon information and belief, the Hometap documents typically consist of a 31-page "Option Purchase Agreement" and a 14-page Mortgage and Security Agreement, with various other documents or exhibits. Those documents that are in the possession of the Plaintiffs are attached hereto as Plaintiffs' Exhibits "A", ("Option Purchase Agreement"), and "B", ("Mortgage and Security Agreement"), respectively.

17. All Hometap's "Option Purchase Agreements", (referred to herein as the Hometap contract or Hometap product), have the same four core features:

a. Cash Advance: They provide upfront cash to homeowners without requiring documentation or underwriting of income, job, or assets other than the home itself. Hometap refers to this cash as the "Investment Amount" rather than what it is, the principal amount of a loan.

b. Equity Devaluation: In exchange for the cash advance, Hometap acquires an interest in a percentage of the homeowner's home equity that well exceeds the percentage of the home value paid to the homeowner via the cash advance.

c. Hometap Percentage/Hometap Cap: Hometap purports to cap its return at a 20% compound annual interest rate, but Hometap's "capped" return routinely exceeds 20% annual interest because Hometap does not calculate the figure based on the full value of the Investment Amount

d. Ten-Year Balloon: The homeowner is not required to make any installment payments to Hometap during the loan term. Instead, at the end of the ten-year term, the homeowner must make a single, very large payment to Hometap, unless Hometap decides to extend the term. Hometap's Option Purchase Agreement permits Hometap to force the sale of the homeowner's home to fund this large, lump sum payment.

18. Hometap's form "Option Purchase Agreement" contains the deceptive and misleading header: **"THIS IS NOT A LOAN."**

19. Under the Agreement, Hometap purportedly "pays", (but in reality *loans*), a sum of money to the homeowner called the "Investment Amount."

20. This amount is paid back through a supposed option to purchase a percentage of the home's future value, called the "Hometap Percentage", which is used to calculate the "Hometap Share."

21. Hometap deducts certain fees and costs from the "Investment Amount" before the consumer receives the "Investment Amount."

22. Some of these fees and costs are purportedly paid to third parties for typical mortgage closing services, such as for appraisals, title charges, and recording fees.

23. Hometap does not disclose the identity of the entities that provide each of the services nor the actual amount paid to that entity.

24. Upon information and belief, Hometap charges the homeowner more for closing services than the amount it pays to third parties for these services.

25. Upon information and belief, the excess of the amount charged for the so-called "third-party costs" are actually retained by Hometap.

26. In addition, Hometap retains a 3% "Hometap Fee". This amount is calculated by multiplying the "Investment Amount" by 3%. Thus, the Plaintiffs' gross "Investment Amount", prior to the deduction of any fees or costs, was $65,000. The "Hometap Fee" was $1,950, yet the Plaintiffs only received a net amount of $61,065 after the following deductions: "Hometap Fee - $1,950", "Appraisal - $299", "Title Charges - $895", and "Government Recording - $791".

27. Under the terms of the Option Purchase Agreement, Hometap will receive a payment from the homeowner equal to a percentage of the value of the home at the time of repayment (called the "Hometap Percentage".)

28. The actual payment of that amount by the homeowner, which will typically be paid through a voluntary or forced sale of the home, is called the "Hometap Share."

29. Under the Hometap contract, repayment must occur within ten years, unless unilaterally extended by Hometap, or earlier upon transfer of title or certain other triggering contractual events (such as a default in payments on other mortgages, default on property taxes or insurance, sale or transfer of the home, or "any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share"). *See* § 7.1(l), Ex. A.

30. The Hometap Share is, functionally, repayment of the original "Investment Amount" plus a profit.

31. The profit to Hometap, its return on investment, is a disguised finance charge for the original amount loaned to the homeowner.

32. Despite what Hometap tells consumers, its products are single-payment mortgage loans with a high rate of effective interest and/or exorbitant finance charges.

**B. Hometap's Product Misleads Homeowners and Puts Vulnerable Homeowners at Risk.**

33. Hometap advertises its product to cash strapped homeowners as a means to pay off unsecured debt, to "get closer to financial freedom", or obtain fast cash for home improvements and the like. *See* https://www.hometap.com/location/florida. (Last visited

on August 4, 2026).

34. In actuality, the Hometap product places a homeowner in a financial trap, stripping their most valuable financial asset – their home equity – from them at an extremely high rate of return for Hometap.

35. Indeed, Hometap's product restricts a homeowner's "freedom" by not allowing the homeowner to sale the house, rent the house, move, take on additional debts, or transfer ownership to a family member without Hometap's approval which is within Hometap's sole discretion. *See, e.g.,* Pls.' Ex. A, §§ 2.6(a), 6.1(b), 6.1(i).

36. Hometap presents itself as working for the joint interest of itself and the homeowner.

37. For instance, Hometap advertises its "Home Equity Investment" product as "mak[ing] homeownership less stressful and more accessible" by "investing alongside homeowners." *See* https://www.hometap.com/faqs (last visited on August 4, 2026).

38. Hometap's real goal is to maximize profits for investors.

39. Hometap also misleads homeowners by touting that they will not have to sell their homes to access their home equity. *See* Hometap FAQ page, ("[Hometap's] home equity investment product provides homeowners with a fast, simple, and straightforward way to access the equity in their home without taking on monthly payments or having to sell.")

40. In reality, homeowners will not be able to refinance with a traditional loan at the end of the contract period, when the payoff to Hometap has dramatically increased, because payments will be even more unaffordable. Instead, in direct contrast to Hometap's promises, the homeowner will be forced to sell – at considerable gain to Hometap and its investors.

41. And while Hometap repeatedly characterizes the Home Equity Investment product as "financing", its contract claims that the payment is "not a loan or any other form of financing transaction." *Cf.* Ex. A, § 4.1(i), ("[T]he payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction...."), *with* Hometap FAQ, "What is a Home Equity Investment? A home equity investment is a flexible, alternative financing solution that allows homeowners to tap into their home's equity without taking on monthly payments or dealing with the stress of traditional financing.") (Last visited August 4, 2026). *See also* Hometap Equity Partners, Home Equity Investments: The Tipping Point for Alternative Financing (2025) at cover, 3, 11, 15 (referring to the product as "financing"), available at https://www.hometap.com/homeowner-resources/tipping-point-alternative-financing. This Hometap brochure even states, "[b]ecause these products are a relatively new form of home financing, there is little guidance on how state law should be applied." *Id.* at p.11.[1]

---

[1] Interestingly, this brochure, which is published by Defendant Hometap Equity Partners, LLC, also states that "[h]istorically, HEIs have operated under a fragmented regulatory framework, with industry participants largely self-governing their practices. As consumer products, HEIs fall under general federal and state laws addressing unfair and deceptive acts and practices." *Id.* This is telling. HEIs are not, in fact, regulated by any federal or Florida agency or governmental office. The product most like HEIs that is legally available to Florida consumers is a traditional reverse mortgage, like a Home Equity Conversion Mortgage, ("HECM"), that is regulated by the Federal Housing Administration. Similar to HEIs, HECMs are repaid in a final lump sum, rather than in monthly payments to the mortgage company, and require consumers to pay insurance and property taxes to maintain the home. They also require the consumer to stay in their home as their primary residence. HECMs, unlike HEIs, however, are only available to consumers age 62 or older; require counseling with a HUD-certified housing counseling agency before origination; and generally allow consumers to stay in their home until they move or die rather than requiring repayment after a specified period of time.

42. Prior to entering a Hometap contract, Hometap does not determine whether a homeowner can repay the Hometap product based on documentation of income, assets, or employment. Hometap also makes no assessment of the homeowner's ability to continue making payments of taxes, insurance, maintenance expenses, or existing mortgage payments, even though failure to make these payments triggers the homeowner's repayment obligation to Hometap. *See* Ex. A, §§ 3.1, 7.1, 7.2(a). In practice, this repayment obligation includes, but is not limited to, Hometap, in its sole discretion, taking joint ownership of the home and selling the home, including the homeowner's interest, to a third-party buyer from which Hometap will receive payment of the "Hometap Share". *Id.*, § 3.1(b).

43. Hometap's only evaluation prior to entering a Hometap contract pertains to a homeowner's ability to repay the Hometap contract through sale or refinancing of the home itself based on the amount of equity a homeowner has in the property.

44. If a homeowner is unable to pay the required percentage of their home's value in cash to Hometap upon expiration of the ten-year term, then Hometap is entitled to "take joint ownership of the Property . . . and [thereafter] solicit[] a Transfer of the entire Property, including [the homeowner's] interest, to one or more Third-Party Buyers . . .." *See* Ex. A, § 3.1(b).

45. Hometap does this after years of requiring and relying on homeowners to invest in their own homes and ensure that the value of the home increases, ensuring that Hometap makes a profit while homeowners end up without their home and stripped of their wealth.

46. Hometap is aware of the serious harm its products can cause, including

forcing people to sell their homes or sink even further into debt.

47. Hometap's product further exploits homeowners through several unscrupulous and unlawful provisions designed to limit the ability of homeowners to vindicate their rights in court, including:

a. The Option Purchase Agreement includes a mandatory arbitration clause. *See* Ex. A, § 8.13. Federal law, however, prohibits arbitration clauses in residential mortgages precisely because it is so important that homeowners can go before a court to save their home. 15 U.S.C. § 1639c(e)(1).

b. The Option Purchase Agreement also seeks to strip Plaintiffs of their right to lawfully available remedies, including actual, statutory, punitive, and consequential damages. *See, e.g.,* Ex. A, § 8.1. No matter how much harm Hometap causes the Plaintiffs, or how many laws Hometap violates, the Option Purchase Agreement provides that "WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL [HOMETAP'S] AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT." *Id.* (Emphasis in the original.)

c. The Option Purchase Agreement also seeks to immunize Hometap by asserting that it is not responsible for the acts of its employees, contractors, or agents. *See* Ex. A, § 8.8. ("We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.")

d. The Option Purchase Agreement's indemnification clause also purports to put Plaintiffs on the hook for Hometap's legal expenses for a range of claims, independent of the outcome of the litigation. *See* Ex. A, § 8.1.

48. These provisions, though unenforceable, have the practical effect of deterring homeowners from realizing their rights and seeking to vindicate those rights – including seeking to protect themselves from Hometap's predatory and unlawful attempts to take their homes and strip them of their home equity.

### C. Hometap's Product Operates Like a Mortgage Loan.

49. Hometap claims that it is exempt from any federal and state lending laws and licensure requirements because its product is not a mortgage loan.

50. Rather than providing appropriate disclosures to homeowners, including the true cost of the loan and the fact that Hometap structures the transaction to ensure that it will be paid back at a profit regardless of whether the home appreciates or depreciates, Hometap disguises the finance charge in its contract as a percentage return on investment in the home's equity in scenarios where the home both appreciates and depreciates.

51. No matter how Hometap labels its product, it is still a mortgage loan because Hometap provides homeowners with an advance of money, receives security through a mortgage on their home, and defers repayment until the end of the contract, to occur within ten (10) years. In other words, homeowners have the obligation to repay Hometap by the very terms of the product.

52. Hometap ensures that, in practice, it will obtain repayment of its initial advance payment (plus a substantial finance charge) because all the conditions for the conclusion of the contract require Plaintiffs to pay Hometap. Any insistence in the Hometap contract that it does not require repayment is simply another way of saying the loan is non-recourse because repayment would be required if the homeowner wished to continue to live in and own the property after ten (10) years.

53. In a civil action brought by the Massachusetts Attorney General against Hometap Equity Partners, LLC and Hometap Management Holdings, LLC, Judge Debra Squires-Lee of the Suffolk County Superior Court, in her Order denying Hometap's motion to dismiss, found that the allegations of the Attorney General's complaint established that the "home equity investment" marketed and sold by Hometap is, in effect and substance, a loan. *See* Ex. "C", p. 11.

54. In this case, the Defendants paid Plaintiffs $61,065, (after fees and costs of approximately $4,000 were deducted from the "Investment Amount" of $65,000), which was roughly 12% of the value of their home as of the signing of the Option Purchase Agreement on August 25, 2022. The Defendants, however, will receive 20.5% of the home's current value if the "Hometap Share" is paid off today. This is based on review of information accessible on the online Hometap Portal as of August 4, 2026, for the Plaintiffs' account, which has an "Investment ID" of FL294959. The "Financial Snapshot" shows the current value of the Plaintiffs' home, as of 5:00 PM CT of August 4, 2026, at $539,478. "Hometap's Share" is $110,847 (or 20.5% of the home's current value.) When the Plaintiffs' "Financial Snapshot" was accessed as of 9:00 AM CT on August 4, 2026, the home's current value was stated by Hometap as $534,062, and Hometap's "Share" was $109,734. Thus, within the span of a single working day, "Hometap's Share" increased by more than $1,000.

55. If, at the time of Plaintiffs' entering into the Option Purchase Agreement on August 25, 2022, 12% of their home's value equaled $65,000, that means that the total value of the home as of August 25, 2022, was assessed by Hometap as $541,666.67. Almost four years later, the Hometap portal as of August 4, 2026, does not show that the value of the home has appreciated. Rather, it is worth a little less than it was in August 2022. Yet, the amount that Hometap claims it is owed is almost double the $61,065 it paid the Plaintiffs almost four years ago. Thus, even without any appreciation of the value of the home, Hometap is guaranteed a significant profit when it exercises its "option" at the end of ten years. And, if the Plaintiffs cannot pay the "Hometap Share", the Defendants can force the sale of their home. If the value of the home appreciates over

that ten-year period, that only increases the amount of the "Hometap Share" that the Plaintiffs owe.

56. That is because the Hometap "home equity investment" structure provides that upon the Plaintiffs' signing the Option Purchase Agreement on August 25, 2022, in return for $61,065, equivalent to 12% of the home's value (after deducting the aforementioned fees and costs), the "Hometap Share" immediately increased to 20.547% if the home's value appreciated even a single dollar above the assessed value at the time of signing. This "spread" existed on day one and had nothing to do with subsequent appreciation.

57. What's more, on February 5, 2026, Hometap provided the Plaintiffs with a "Hometap Owner Repurchase Settlement Statement", (attached hereto as Pls.' Ex. "D"). This Settlement Statement provides that the "settlement amount is only valid for a home value of $525,353.00."[2] *See* Ex. D, p. 3. The Settlement Statement provides that if the Plaintiffs pay Hometap $89,956.19 by February 5, 2026, it would constitute an "Owner Repurchase of the Option, (or, as we call it, a settlement.") Thus, from February 5, 2026, to August 4, 2026, the Plaintiffs' home has appreciated $14,125, based on Hometap's own data, but the "Hometap Share" has increased in that same time period by $20,891.

58. While Hometap shares in the home's appreciation, if the home loses value, the company does not actually share in a homeowner's losses. The large discrepancy

---

[2] Since this assessed value as of February 5, 2026, is less than the assessed value at the time the Plaintiffs entered into the Option Purchase Agreement on August 25, 2022, the Hometap "home equity investment" structure applies a lesser percentage of 17.123% than the initial "spread" of 20.547%. This is still nearly $30,000 more than was paid to the Plaintiffs by the Defendants upon their signing the Option Purchase Agreement. Thus, by its very nature, the Hometap "home equity investment" product guarantees Hometap, and its investors, significant profits regardless of appreciation of the home. As alleged herein, however, this is not how these products are marketed.

between how much Hometap pays at the outset and how much it will receive means that Hometap will get paid even if the home drops dramatically in value. And that is without even accounting for the thousands of dollars in opaque fees that Hometap requires at the outset.

59. Hometap's contract contains a number of features to further ensure that nothing will decrease the value of the home or jeopardize its future payment:

a. Hometap requires homeowners to pay for all the taxes, insurance, and repairs on the home. *See* Ex. A, §§ 6.1(c), 6.1(d), 6.1(j). Otherwise, Hometap can foreclose on the home to get its payment or make "Hometap cure payments," which themselves accrue interest and have to be paid back. *See* Ex. A, § 7.2(b).

b. Hometap limits the homeowner's ability to rent out the home or leave the property. *See* Ex. A, § 6.1(b); *see also* "IPE Webinar: Home Equity Investments: An Untapped Asset Class/Hometap", https://www.youtube.com/watch?v=NabDHTVlp3Y, at 30:02 (explaining that investors will see profit because the homeowner will pay for upkeep of the property and ensure that its value increases, unlike a renter).

c. Hometap caps the amount of any additional home secured debt that the homeowner can take on. *See* Ex. A, § 6.1(i).

d. Hometap also ensures that it will get sufficient money from the sale of the home by giving itself significant power over the sale. If Hometap determines that the sale price is too low, Hometap can "in its sole discretion" calculate the value of the "Hometap Share" based on appraisal instead of the sale price, and the homeowner has to bear the costs of all such appraisals. *See* Ex. A, §§ 2.1, 2.3(g).

e. The contract's 10-year maturity date ensures that it will not take a loss: Hometap CEO Jeffrey Glass has explained that there have been "only three time periods in American history where over a 10-year period the average home in America has had any level of realized decline" and that even then, the amount of decline has been minimal. *See* IPE Webinar at 23:02.

f. Hometap's (but not the homeowner's) option to extend the contract up to an additional 10 years also allows it to ensure that it will be paid back, with a profit. See Ex. A, § 1.5.

60. Hometap's statements to its investors confirm it will be paid back at a profit.

For instance:

a. Hometap states that it has a "Proven track record" including "8+ years delivering strong, risk-adjusted returns…in both rising and declining home value environments." Hometap Investment Homepage, https://invest.hometap.com/ (last accessed August 10, 2026); *see also id.* (touting that "investors reap the benefits of U.S. home price appreciation without the complexities that historically come with large-scale residential real estate investing," and further explaining that a "combination of data science, technology, thorough underwriting creates high quality assets"—that is, a high rate of return); IPE Webinar at 1:16 (explaining that Hometap has a "very big focus on technology and data science…for ensuring that we're creating a really strong portfolio for capital").

b. Hometap explains that it "structure[s] these [products] in a way that we're able to create meaningful downside protection for capital" and that it recognizes that "we have to deliver appropriate risk-adjusted returns for investors who care about downside protection and Sharpe ratios." *See* IPE Webinar at 12:40.

c. Hometap further explains that despite the ten-year contractual period, Hometap knows that it will "always see a percentage of the portfolio turn each year and that provides the cash flow back to investors" because of refinances and sales. *See* IPE Webinar at 37:18.

61. In addition, while the Hometap product does have the characteristics of a mortgage loan, its product does not have the characteristics of an option, including:

a. Unlike with a typical option contract, the contract terms demonstrate that Hometap does not intend to own the real property on exercise of its so-called "option." Instead, the transaction is structured to ensure that Hometap is paid back financially, primarily either through forced or voluntary sale.

b. As described above, the product shifts all risk and costs onto consumers and is designed to ensure that Hometap will always benefit from exercising the option, unlike a true option contract.

c. The homeowner has a contractual right to "repurchase" Hometap's purported "option" to acquire a percentage interest in the home, which is not a feature of a typical option contract and reflects Hometap's true intention that consumers pay back Hometap at a profit. *See* Ex. A, § 2.4.

d. A standard option creates a contractual right only, not a property right. Here, Hometap's mortgage on the consumer's home and various contractual terms creating obligations on the homeowner throughout the life of the contract gives it not just a "contractual right" to purchase home equity in the

future, but an immediate interest in the property in the present.

e. A typical option to purchase real estate involves both consideration for the option agreement and consideration representing the purchase price if the option is exercised. Here, Hometap has structured its product so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Hometap pays the "purchase price" for the consumer's home equity up front, and the "exercise payment" at the end of the ten-year term is, at most, a nominal 1% of the cash amount loaned to the consumer. *See* Ex. A, § 3.1(e).

f. Hometap's statements to consumers about how to "settle" the contract demonstrate that it only contemplates being paid back and does not contemplate any scenario in which it will not exercise the option. *See* Pls.' Ex. D.

62. The Hometap product also contains various costs that are the same kind of costs incurred with a loan.

63. In sum, Hometap has structured its product from top to bottom to ensure that as a practical matter it will receive repayment of its advance plus a significant profit – at a benefit to investors and a huge loss to homeowners.

64. Getting homeowners to sign these agreements, which are, in effect, reverse mortgage loans without the legal restrictions placed on the origination of reverse mortgage loans, as illustrated in footnote 1, *supra*, is just the first step in Hometap's business model. Hometap then bundles and securitizes these residential mortgage contracts and sells them to investors.

**D. Federal and State Laws Protect Homeowners like Plaintiffs from Hometap's Business Practices.**

65. Congress and the Florida legislature have passed laws to protect homeowners like Plaintiffs from complex and confusing financial products that can cause people to lose their homes.

66. While the federal Truth in Lending Act, 15 U.S.C. §1602 *et seq*., ("TILA"),

protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

67. For example, mortgage lenders must ensure that homeowners have the ability to repay the loan. 15 U.S.C. § 1639c(a)(1).

68. Companies originating mortgages must also be licensed under applicable federal and state laws. 15 U.S.C. § 1639b(b)(1)(A).

69. Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." 15 U.S.C. § 1639c(e)(1).

70. Florida law requires disclosures and protections for mortgages generally, *see* Chapter 494, Florida Statutes, as well as licensing requirements for entities acting as a mortgage lender in Florida. *See* Fla. Stat. § 494.00611.

71. Florida also prohibits the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatsoever, at a higher rate than the equivalent of 18 percent per annum simple interest. *See* Fla. Stat. §§ 687.02; 687.03.

**E. Plaintiffs' Experience is Typical.**

72. The Plaintiffs purchased their home at 5344 Moon Shadow Lane in Greenacres, Florida in June 2017. At all times material to this action, it was the Plaintiffs' principal dwelling.

73. In 2022, the Plaintiffs sought to obtain a home equity line of credit ("HELOC") to pay down high-interest credit card debt. While searching online for HELOC

options, Plaintiffs encountered advertising by Hometap for its "home equity investment" product. Upon information and belief, Hometap purchases search-engine advertising keyed to consumers searching for HELOCs and similar, more conventional loan products, and represents in its advertising and sales communications with prospective customers that its "home equity investment" product is not a loan, involves no interest or monthly payments, and has no credit impact.

74. The advertising on the Hometap website viewed by the Plaintiffs indicated that customers purchasing a "home equity investment" are not taking out a loan, so it wouldn't impact the Plaintiffs' credit, and the Plaintiffs wouldn't have to make monthly payments on top of their existing mortgage.

75. After reviewing the online advertising, the Plaintiffs filled out a contact form, and shortly thereafter were contacted via telephone by a Hometap representative. This representative, Annie Buff, informed the Plaintiffs that the "home equity investment" product was a new concept that is better than a loan or HELOC because there are no monthly payments and it doesn't impact your credit. Ms. Buff further stated that Hometap was simply investing in a percentage of the Plaintiffs' home's equity, and they wouldn't have to pay back the initial investment before ten (10) years passed.

76. After the Plaintiffs indicated their desire to purchase the "home equity investment" product with Ms. Buff over the phone, Hometap subsequently requested copies of their driver licenses, a copy of their most recent mortgage statement, and a copy of their most recent statement for solar panels installed on the roof of their residence.

77. On August 25, 2022, a notary public, who was not an employee or representative of Hometap, came to the Plaintiffs' home with copies of the Option Purchase Agreement and Mortgage and Security Instrument for them to sign. *See* Pls.'

Exs. A and B, respectively. The Mortgage and Security Agreement granted Hometap a mortgage on the Plaintiffs' home, which secured the Plaintiffs' obligations under the Agreement on penalty of foreclosure.

78. The Plaintiffs never met in person with anyone from Hometap during this process. The Plaintiffs were not provided copies of the actual documents they signed prior to their signing them when the notary public produced them on August 25, 2022. A signed copy of the Option Purchase Agreement was not provided to the Plaintiffs until they specifically requested one sometime later.

79. The Plaintiffs did not have any opportunity to negotiate the terms of the Option Purchase Agreement or Mortgage and Security Agreement. The Plaintiffs were not represented by independent counsel at or before the signing of these documents, were not referred to or required to obtain any independent counseling regarding the transaction and were presented with a lengthy set of documents to sign on a take-it-or-leave-it basis after months of going through the Hometap "approval" process. The Plaintiffs were not evaluated for their ability to repay the eventual balloon obligation, described *infra*, and Hometap did not consider Plaintiffs' income, expenses, or other financial resources before advancing the Plaintiffs the "Investment Amount" of $65,000.

80. Under Hometap's contract, Hometap disbursed to the Plaintiffs the "Investment Amount" of $65,000 as 12% of the assessed "Beginning Home Value." The Plaintiffs actually received, however, $61,065 after deductions for the following:

a. A "Hometap Fee" of $1,950 (3% of the "Investment Amount" of $65,000);

b. A $299 appraisal fee;

c. $895 in title charges; and

d. $791 in government recording fees.

81. Upon information and belief, these fees exceed the amount of the actual costs of the services provided.

82. Essentially, the Option Purchase Agreement provided an "Investment Amount" of $61,065, after deduction of fees and costs, in return for a "Hometap Percentage" of 20.547% of the Plaintiffs' home's value if the value at the time of settlement or repayment is at or above the assessed value at signing on August 25, 2022, or 17.123% if the value at settlement or repayment is below the assessed value at signing, subject in either case to the "Hometap Cap" described below.

83. Section 2.2 of the Option Purchase Agreement provides that the amount Hometap is entitled to receive at settlement, (the "Hometap Share"), "shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount", a limitation the contract itself labels the "Hometap Cap."

84. An "annualized rate of return" calculated on a fixed principal amount, in exchange for the payment of that principal amount up front and a contractual ceiling on what may be collected, is the very definition of interest on a loan.

85. Notwithstanding this language, the Option Purchase Agreement separately and repeatedly asserts that this transaction is "not a loan" and that under no circumstances will the "Investment Amount accrue interest." *See, e.g.*, Ex. A, § 4.1(j).

86. Hometap does not disclose the methodology, data sources, or model used to generate its automated valuation model, or AVM, used to value the Plaintiffs' home in any given calendar quarter. Thus, there is no way to verify, audit, or contest it.

87. This valuation model can cause wild swings in the settlement amount should the Plaintiffs wish to pay Hometap and remove the mortgage lien on their property.

For example, between the second and third quarters of 2025, Hometap's own AVM estimate of the Plaintiffs' property value rose by only 2.83% (from $522,502 to $537,295) – yet the amount the Defendants claimed Plaintiffs would owe to settle the transaction rose by 23.39% (from $89,468 to $110,398), an increase of $20,930.

88. Hometap's AVM-based pricing formula is not disclosed to prospective customers, including the Plaintiffs, in any manner that would permit them to understand, before signing, that a change in an opaque, third party-generated home value estimate of less than 3% could alter their payoff obligation by tens of thousands of dollars.

89. Additionally, the Plaintiffs are required to cover 100% of the fees and costs associated with ending the Hometap contract, including all costs related to any sale or refinancing of the home. *See* Ex. A, §§ 2.4(g), 2.6(d).

90. This can often be tens of thousands of dollars of closing costs, appraisal expenses, and inspection expenses.

91. Plaintiffs are also purportedly required to pay any fees or costs that Hometap has incurred during the course of the contract. *See, e.g.,* Ex. A, §§ 6.1(g), 8.1.

92. On July 27, 2026, the Plaintiffs received notice that effective August 3, 2026, the servicing of their "home equity investment" was being transferred to Defendant Hometap Homeownership Solutions, LLC, a subsidiary of Hometap Equity Partners, LLC. See Pls.' Ex. "E".

93. In sum, the Hometap product is structured in such a way that Plaintiffs cannot repay the amount of money demanded by Hometap at the end of ten (10) years without either selling their home, which Hometap can contractually force, or sinking deeper into debt that they cannot afford.

## EXISTENCE AND PREDOMINANCE OF COMMON QUESTIONS OF LAW AND FACT AND UNIFORMITY OF MISCONDUCT TOWARDS ALL MEMBERS OF THE PUTATIVE CLASS

94. All conditions precedent to the filing of this action have occurred, have been performed, have been waived, or have been excused.

95. As alleged herein, the Defendants and other Hometap entities identified in paragraph 11, *supra*, have acted on grounds generally applicable to all members of the putative class.

96. There are questions of law and fact common to the class. These common questions of law and fact predominate over any questions affecting only individual members of the class. Facts and legal questions common to all members of the class include, but are not limited to, the following:

a. Whether Hometap's Option Purchase Agreements are effectively mortgage loans;

b. Whether Hometap's Option Purchase Agreements are subject to federal and state consumer lending laws;

c. Whether Hometap's Option Purchase Agreements violated federal and state consumer protection laws;

d. Whether all consumers in Florida within the statutory limtiations period that are subject to Hometap's Option Purchase Agreements are entitled to damages;

e. Whether all consumers in Florida within the statutory limtiations period that are subject to Hometap's Option Purchase Agreements are entitled to a declaratory judgment;

f. Whether Hometap acted willfully, intentionally and/or recklessly in violating

federal and state consumer lending laws;

g. Whether Hometap wrongfully retains fees and costs, in part or in full, associated with the "home equity investment";

h. Whether the same law applies to all class members' claims.

i. Whether the Plaintiffs and class members are entitled to class relief as requested herein pursuant to Rules 1.220(a) and (b)(2) and/or (b)(3), Fla. R. Civ. P.

**TYPICALITY AND NUMEROSITY**

97. The claims of the named Plaintiffs are typical of the claims of the class. Upon information and belief, the number of putative members of the class is at least forty persons rendering joinder of individual class members impracticable.

**ADEQUATE REPRESENTATION**

98. Plaintiffs will fairly and adequately protect the interests of the members of the class and have no interests antagonistic to those of other class members. Plaintiffs have retained class counsel competent to prosecute class actions and such class counsel is financially able to represent the classes.

**SUPERIORITY**

99. The class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all members of the class is impracticable. The interests of judicial economy favor adjudicating the claims for the Plaintiffs' class rather than on an individual basis. The class action mechanism provides the benefit of unitary adjudication, economies of scale and comprehensive supervision by a single court.

100. Hometap has acted on grounds generally applicable to all members of the class, and questions of law and fact predominate over any questions affecting only individual members. The prosecution of separate claims or defenses by or against individual members of the class would create a risk of inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the Defendants.

## COUNT I

### VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (Individual and Class Claims)

101. Paragraphs 1-100 of this complaint are incorporated by reference as though fully set forth herein.

102. Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, ("FDUTPA"), prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

103. The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

104. Plaintiffs and each member of the putative class, as "consumers" under FDUTPA (Fla. Stat. § 501.203(7)), have been harmed by the Defendants' unconscionable, deceptive, and unfair acts and practices alleged herein.

105. Defendants' violations of FDUTPA include their failure to adequately or properly disclose the true cost of the Hometap "home equity investment" transaction; assessing improper and excessive fees, finance charges, and costs; marketing what is,

in actuality, a mortgage loan that would most likely have to be paid through the forced sale of the Plaintiffs' home; falsely claiming that the product is not a loan; claiming that Hometap prioritizes the "homeowner-first" when in fact investment gains are the higher, if not only, priority; representing or implying by their conduct that the Defendants were authorized to engage in the "home equity investment" transaction or that it was compliant with federal and state lending laws; falsely claiming that Hometap provides freedom to the homeowner while obscuring the fact that it restricts the homeowner's freedom to engage with their home as they wish; failing to underwrite the loan for ability to repay it without loss of the home; failing to disclose, in terms a reasonable consumer would understand before signing, how the AVM determines home value for purposes of calculating the "Hometap Share"; marketing the "home equity investment" product as having "no credit impact" without comparably prominent disclosure of the true cost and risk of the transaction; and representing the product using investment and partnership terminology designed to obscure its functional character as a high-cost loan.

106. The Defendants' "home equity investment" product constitutes a violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. and Regulation Z, 12 C.F.R. Part 1026, (collectively, "TILA"), which thereby constitutes a violation per se of FDUTPA, Fla. Stat. 501.203(3), by:

a. entering into the aforementioned Option Purchase Agreement with Plaintiffs, which was, in effect, a "residential mortgage loan" as defined by 15 U.S.C. § 1602(dd)(5), while being unlicensed to originate mortgage loans in Florida, 15 U.S.C. § 1639b(b)(1)(A);

b. failing to make a reasonable and good faith determination that Plaintiffs had the ability to repay the loan, 15 U.S.C. § 1639c(a);

c. failing to provide Plaintiffs with any of the disclosures required by TILA for residential mortgage loans, including, but not limited to, those required by 15 U.S.C. § 1638(a), 1639(a); 12 C.F.R. §§ 1026.19, .23, .31, .37, and .38;

d. including a mandatory arbitration clause in the Option Purchase Agreement, 15 U.S.C. § 1639c(e); and

e. in the alternative, failing to comply with TILA's reverse mortgage protections, including failing to provide the required disclosures, despite that the loan (alternatively) is in effect a reverse mortgage as defined by statute, 15 U.S.C. §§ 1602(cc), 1648, 12 C.F.R. § 1026.33.

107. Hometap's contracts are unconscionable and cause injury to consumers that outweighs the utility of Hometap's conduct, including but not limited to the following ways:

a. Property owners, like the Plaintiffs, provide highly disproportionate returns to Hometap in comparison to the advances they receive;

b. Even though Defendants receive a disproportionate payout from the value of the home, it requires that homeowners like Plaintiffs bear all costs in order to protect and increase Defendants' profits, including costs associated with the purchase of the property, the costs of maintenance of the property, payment of taxes and insurance, payment of all seller's costs, and payment of additional fees;

c. These products can destroy intergenerational transmission of wealth, especially for working-class families;

d. Defendants offer these products without sufficient independent counseling about their lengthy contracts, which contain complex and convoluted terms that are difficult for ordinary homeowners to understand;

e. Defendants include these highly one-sided terms to increase its profits and returns to its own investors; and

f. There are other viable methods for homeowners to access equity in their homes that do not involve these predatory features and are far less dangerous to homeowners.

108. The Defendants' business practices alleged herein are likely to mislead consumers acting reasonably under the circumstances, are unconscionable, offend public policy, and are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

109. The Defendants and Hometap entities' failure to comply with the mortgage lender licensing requirements under Chapter 494 of the Florida Statutes constitutes a per se violation of FDUTPA.

110. As a result of the deceptive, unfair and unconscionable practices described above, Plaintiffs and each putative class member entered into the Hometap Option Purchase Agreement and suffered an ascertainable loss of money or property as the result of Defendants' conduct, including, but not limited to, fees, improper encumbrance of title, and diminution of value of Plaintiffs' interest in the property.

111. Wherefore, Plaintiffs, on behalf of themselves and each member of the putative class, demand trial by jury and all remedies and damages available to them, including, but not limited to, (1) a declaration that the Defendants' conduct is a deceptive, unfair, and/or unconscionable practice, and that the Defendants' jointly and severally violated the Florida Deceptive and Unfair Trade Practices Act; (2) a declaration that the Plaintiffs and the Class are not liable for any finance charges or other charges imposed by Defendants and the Hometap entities identified in paragraph 11, *supra*; (3) an injunction enjoining the Defendants and the Hometap entities identified in paragraph 11, *supra,* from continuing to engage in such deceptive, unfair, and/or unconscionable business practices by offering these "home equity investment" products to real property owners in Florida; (4) an injunction enjoining the Defendants and the Hometap entities identified in paragraph 11, *supra*, from enforcing the unfair and unconscionable terms of the Option Purchase Agreements and Mortgage and Security Agreements against the Plaintiffs and putative class members; (5) a Court order terminating any security interest in the Plaintiffs' and putative class members' property created as part of, or in association with, the Hometap transactions; (6) any and all actual damages suffered by the Plaintiffs

and the putative class members as a result of the Hometap transactions, including, but not limited to, the difference between the value the Defendants and Hometap entities have claimed and will claim at settlement and/or repayment and the fair value of the consideration Plaintiffs and the putative class members actually received; (7) interest; (8) the attorneys' fees and costs incurred in bringing this action pursuant to Fla. Stat. §§ 501.201, *et seq.*; and (9) all such further and additional relief as the Court deems necessary and just.

**COUNT II**

**CIVIL USURY**
**(Individual and Class Claims)**

112. Paragraphs 1-100 of this complaint are incorporated by reference as though fully set forth herein.

113. The Hometap "home equity investment" is, in substance, a loan of money secured by a mortgage on real property located in Florida, notwithstanding its "Option Purchase Agreement" label.

114. The Option Purchase Agreement, and the Hometap "home equity investment", are structured such that the money advanced shall be returned by the Plaintiffs and putative class members to the Defendants.

115. The principal amount advanced to the Plaintiffs by the Defendants is less than $500,000, such that the maximum lawful rate of interest under Fla. Stat. § 687.03 is 18% per annum.

116. The payment required of the Plaintiffs at the end of the ten (10) year term under the Option Purchase Agreement constitutes a greater rate of interest than is allowed by Florida law.

117. The effective annualized rate of return the Defendants have charged and continue to charge the Plaintiffs, calculated using Hometap's own reported figures, exceeds 18% per annum in multiple quarters, and the "Hometap Cap" itself – the contractual ceiling on Hometap's return – is fixed at 20% per annum, compounded, which independently exceeds the statutory maximum.

118. The Defendants, and the Hometap entities identified in paragraph 11, *supra*, possessed a corrupt intent to take more than the legal rate for the use of the money loaned.

119. Wherefore, Plaintiffs, on behalf of themselves and each member of the putative class, demand trial by jury and all remedies and damages available to them, including, but not limited to, (1) a declaration that the Hometap "home equity investment" is usurious; (2) a declaration that the Plaintiffs and the putative class members are not liable for any interest charged by Defendants and the Hometap entities identified in paragraph 11, *supra*, pursuant to Fla. Stat. § 687.04; (3) a Court order forfeiting all interest the Defendants and Hometap entities identified in paragraph 11, *supra*, claim they are owed by the Plaintiffs and putative class members where such interest has not yet been taken, reserved, or paid; (4) where usurious interest has already been taken, reserved, or paid to the Defendants and the Hometap entities identified in paragraph 11, *supra*, a Court Order forfeiting <u>double</u> the amount of interest so reserved, taken, or exacted pursuant to Fla. Stat. § 687.04 from the Plaintiffs or putative class members; (5) interest; (6) costs incurred in bringing this action; and (7) all such further and additional relief as the Court deems necessary and just.

120. Additionally, should the Court find any attorney fee provision contained in either the Option Purchase Agreement, or Mortgage and Security Agreement, to be valid

and enforceable, even if purporting to only award fees to any Defendant that is a contracting party, or third-party beneficiary thereto, the Plaintiffs respectfully request an award of attorney fees pursuant to Fla. Stat. § 57.105(7).

**<u>COUNT III</u>**

**QUIET TITLE/DETERMINATION OF VALIDITY AND EXTENT OF HOMETAP LIEN (Individual Claim)**

121. Paragraphs 1-100 of this complaint are incorporated by reference as though fully set forth herein.

122. Plaintiffs own the following real property located in Palm Beach County, Florida: 5344 Moon Shadow Lane, Greenacres, Florida 33463. It is their principal dwelling and has been at all times material hereto.

123. Plaintiffs obtained ownership of this real property by deed or instrument dated June 7, 2017, recorded on June 16, 2017, in official records book O 29157, page 1988 of the public records of Palm Beach County, Florida.

124. On September 6, 2022, Defendant Hometap Investment Partners III SPV, LLC, recorded that Mortgage and Security Agreement, dated August 25, 2022, in official records book O 33820, page 60, purportedly creating a security interest in, and right of foreclosure over, the Plaintiffs' real property to secure the obligations set forth in the Option Purchase Agreement of that same date.

125. This Mortgage and Security Agreement is a cloud on Plaintiffs' title to the real property located at 5344 Moon Shadow Lane, Greenacres, Florida 33463.

126. This Mortgage and Security Agreement as alleged herein, *supra*, is invalid and unlawful as is the Option Purchase Agreement whose obligations the Mortgage and Security Agreement is meant to secure.

127. Wherefore, Plaintiffs respectfully request the Court to enter an order to quiet title in and award the Plaintiffs with the same title and rights to the aforementioned real property that the Plaintiffs enjoyed before entering into the Option Purchase Agreement and Mortgage and Security Agreement. The Plaintiffs further request that the Mortgage and Security Agreement be canceled and removed from the title. Lastly, the Plaintiffs respectfully request an award of costs incurred in prosecuting this action, damages for pecuniary losses associated with the invalid Mortgage and Security Agreement and applicable prejudgment interest on any such losses.

128. Additionally, should the Court find any attorney fee provision contained in either the Option Purchase Agreement, or Mortgage and Security Agreement, to be valid and enforceable, even if purporting to only award fees to any Defendant that is a contracting party, or third-party beneficiary thereto, the Plaintiffs respectfully request an award of attorney fees pursuant to Fla. Stat. § 57.105(7).

## COUNT IV

## UNCONSCIONABLE CONTRACT
## (Individual and Class Claims)

129. Paragraphs 1-100 of this complaint are incorporated by reference as though fully set forth herein.

130. The Defendants' Option Purchase Agreement and Mortgage and Security Agreement are procedurally unconscionable because they were presented to Plaintiffs on a standardized, non-negotiable, take-it-or-leave-it basis.

131. The Plaintiffs had no meaningful opportunity to negotiate their terms.

132. The Plaintiffs were not represented by independent counsel, nor were the Plaintiffs required to receive, or received, independent counseling of the kind

customarily required for comparable mortgage products.

133. The Defendants' Option Purchase Agreement and Mortgage and Security Agreement are substantively unconscionable because their terms are unreasonably favorable to Defendants and oppressive to Plaintiffs, including without limitation: (a) a two-tier, threshold based pricing formula described above which ties tens of thousands of dollars in additional obligation to an opaque, unverifiable, and non-proportional valuation trigger; (b) the Hometap Cap, which permits the Defendants to collect a return in excess of Florida's usury limits; (c) an irrevocable power of attorney permitting Hometap to encumber or sell the Plaintiffs' home; (d) uncapped, one-sided fee-shifting and indemnification provisions requires Plaintiffs to pay Defendants' costs and fees in any dispute relating to the Plaintiffs' property; and (e) arbitration and class action waiver provisions in the Agreements.

134. The Option Purchase Agreement and Mortgage and Security Agreements, or portions thereof, are void or voidable as unconscionable under Florida law.

135. Wherefore, Plaintiffs, on behalf of themselves and each member of the putative class, demand a trial by jury and respectfully request that this Court declare the Option Purchase Agreement and Mortgage and Security Agreement, or the unconscionable provisions thereof, void and unenforceable, and award such other relief as the Court deems just and proper.

136. Additionally, should the Court find any attorney fee provision contained in either the Option Purchase Agreement, or Mortgage and Security Agreement, to be valid and enforceable, even if purporting to only award fees to any Defendant that is a contracting party, or third-party beneficiary thereto, the Plaintiffs respectfully request an award of attorney fees pursuant to Fla. Stat. § 57.105(7).

**COUNT V**

**UNJUST ENRICHMENT**
**(Individual Claim)**

137. Paragraphs 1-100 of this complaint are incorporated by reference as though fully set forth herein.

138. This count is pled in the alternative to the extent the Option Purchase Agreement or Mortgage and Security Agreement are found void, unenforceable, or unconscionable in whole or in part.

139. Plaintiffs conferred a benefit on Defendants by, among other things, paying fees at signing and by their home remaining subject to the Defendants' claimed interest.

140. The Defendants have accepted and retained that benefit.

141. It would be inequitable for the Defendants to retain the benefit conferred without paying Plaintiffs the value thereof.

142. Wherefore, the Plaintiffs respectfully request that this Court award restitution and such other relief as the Court deems necessary and just.

**COUNT VI**

**FRAUD**
**(Individual Claim)**

143. Paragraphs 1-100 of this complaint are incorporated by reference as though fully set forth herein.

144. The Defendants made materially false representations with the intent of deceiving the Plaintiffs and inducing them into signing the Option Purchase Agreement. By misrepresenting to Plaintiffs that its HEI product was "not a loan", the Defendants fraudulently induced the Plaintiffs to believe that they were simply entering into a home-

equity sharing option. Hometap also represented the transaction as an "Option Purchase Agreement," but restricted Plaintiffs with the severe obligations and threats consistent with a traditional mortgage lender while representing to the Plaintiffs that the HEI product was "not a loan."

145. Furthermore, Hometap's Investment Disclosures deceived Plaintiffs by framing its "Hometap Cap" feature as a consumer safeguard, when, in reality, the "Cap" operated to Plaintiffs' detriment by functioning as a guaranteed 20% annualized rate of return on Hometap's initial disbursement to the Plaintiffs. As structured, even when the Plaintiffs' property depreciates in value, Hometap can utilize the 20% Hometap Cap to demand an inflated payout.

146. The "Option Purchase Agreement" misleadingly omits the true cost of Hometap's loan to the Plaintiffs. This is a material omission, since the amount a homeowner will have to pay the Defendants will be very important to their decision of whether to enter into the "Option Purchase Agreement."

147. The Defendants also misleadingly omitted the fact that they are not licensed to engage in lending, mortgage lending, or mortgage origination through their purported equity sharing agreements. A reasonable consumer is likely to be deceived by this omission, since they would not suspect that the Defendants' products are illegal, unlicensed loans. This omission is also material, since a reasonable consumer would attach importance to the fact that the company placing a mortgage on their home and lending them money is doing so illegally.

148. Upon information and belief, the Defendants' representations regarding the fees assessed with the origination of the "Option Purchase Agreement" are false and/or misleading, in that the Defendants profit from these fees while indicating that they are

bona fide fees reflecting the costs of the transaction.

149. The Defendants fraudulent misrepresentations and omissions included, in addition to those already alleged herein, *supra*: claiming that "option" agreement is not a right that Hometap intends to exercise; falsely claiming that the Hometap product is not a loan, when it is a loan; failing to adequately or properly disclose the true cost of the transaction; assessing improper and excessive, fees, finance charges, and costs; falsely claiming that the Plaintiffs have no monthly obligations when the "Option Purchase Agreement" and "Mortgage and Security Agreement" impose monthly obligations on the Plaintiffs; representing or implying by its conduct that the Defendants were authorized to engage in the complained of transaction; falsely claiming that the Hometap product provides freedom to the homeowner while obscuring the fact that it restricts the homeowner's freedom to engage with their home as they wish; failing to properly underwrite the loan for ability to repay it without loss of the home; drafting the contract in an intentionally confusing and overly complex manner that makes it extremely difficult to understand; and failing to comply with applicable statutes and regulations such as the Truth in Lending Act and its implementing regulation, Regulation Z.

150. The Plaintiffs were damaged in relying on the Defendants' knowingly false misrepresentations and omissions.

151. Wherefore, the Plaintiffs respectfully request that this Court award damages resulting from the Defendants' fraudulent practices and all other remedies and relief deemed necessary and just.

152. Additionally, should the Court find any attorney fee provision contained in either the Option Purchase Agreement, or Mortgage and Security Agreement, to be valid and enforceable, even if purporting to only award fees to any Defendant that is a

contracting party, or third-party beneficiary thereto, the Plaintiffs respectfully request an award of attorney fees pursuant to Fla. Stat. § 57.105(7).

*/s/ Brian D. Hancock*

Brian D. Hancock
Florida Bar No. 0107341
TAYLOR, WARREN, WEIDNER,
HANCOCK & BARNES, P.A.
1700 W. Main Street, Suite 100
Pensacola, FL 32502
T: (850) 438-4899
F: (850) 438-4044
Attorney for Plaintiffs
Primary e-mail: bhancock@twwlawfirm.com
Secondary e-mail:
kescamilla@twwlawfirm.com

EXHIBIT
A

Investment No.: FL294959

**THIS IS NOT A LOAN.**

**THIS IS AN AGREEMENT PURSUANT TO WHICH A HOMEOWNER RECEIVES PAYMENT IN EXCHANGE FOR AN OPTION TO PURCHASE A SPECIFIED PERCENTAGE INTEREST IN THE HOMEOWNER'S HOME THAT MAY BE EXERCISED IN THE FUTURE UPON THE OCCURRENCE OF CERTAIN EVENTS SUCH AS A SALE OF THE HOME.**

## OPTION PURCHASE AGREEMENT

This Option Purchase Agreement (this "**Agreement**") is entered into as of the date of last signature (the "**Signing Date**") by and between Hometap Investment Partners III SPV, LLC, a Delaware limited liability company with its principal offices at 800 Boylston Street, 16th Floor, Boston, MA 02199 ("**we**", "**our**", "**us**", and/or "**Hometap**"), and the homeowner(s) set forth on the signature page attached hereto under the heading of "Owner" ("**you**", "**your**", and/or the "**Owner**"). Capitalized terms used in this Agreement but not otherwise defined shall be defined as set forth in the Investment Term Sheet (as defined below).

**WHEREAS**, Hometap wishes to purchase an exclusive and irrevocable option to acquire, in the future, a percentage possessory interest in Owner's home according to the terms and conditions of this Agreement and to provide the Owner with consideration in exchange for granting such an option;

**WHEREAS**, the Owner wishes to grant Hometap the requested option according to the terms and conditions of this Agreement in exchange for the Investment Amount and understands that by doing so, Hometap shall immediately have a contractual and economic interest in the Owner's home that may be exercised in the future, at which time Hometap may have a possessory interest in the Owner's home;

**WHEREAS**, Hometap wishes to protect its economic interest in the Option through the mechanisms identified in this Agreement and the concurrent Mortgage and Security Agreement, and these and other documents shall be recorded in a manner to establish the priority of Hometap's economic interest;

**WHEREAS**, as of the Signing Date, the Owner and Hometap have conducted and completed the execution of this Agreement (the "**Investment Signing**") at which the Owner has reviewed, confirmed, executed, and returned to Hometap a full, complete, and accurate Investment Term Sheet (the "**Investment Term Sheet**"), which together with this Agreement define, among other information, the Beginning Home Value, Investment Amount, Net Investment Amount, Hometap Percentage, Hometap Share, and Investment Fee;

**WHEREAS**, as of the Signing Date, Hometap has deposited the Investment Amount, as set forth in the Investment Term Sheet, in escrow with the Settlement Agent, which shall be disbursed upon the Effective Date in accordance with the terms and conditions of this Agreement;

**WHEREAS**, the Investment Term Sheet sets forth certain fees, costs, and expenses that Hometap shall incur and/or charge to the Owner in connection with its purchase of the Option;

**WHEREAS**, the Investment Term Sheet is attached and made a part of this Agreement as Schedule A; and

**WHEREAS**, in reliance upon the Investment Term Sheet, and the terms and conditions set forth in this Agreement, Hometap wishes to purchase the Option, and the Owner wishes to sell the Option and accept the Investment Amount, as described in this Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Owner and Hometap agree as follows:

## SECTION 1
## OPTION PURCHASE

Section 1.1 Option and Hometap Percentage. You agree to sell to Hometap an exclusive and irrevocable option (the "**Option**") to acquire an undivided percentage interest (the "**Hometap Percentage**") of fee simple title ownership in that certain residential real property owned by the Owner as more fully identified and described on Exhibit A (the "**Property**"), which is attached and made a part of this Agreement. The Property will include only the real property described in Exhibit A and fixtures appurtenant thereto.

Section 1.2 Agreement Execution and Delivery. In connection with the execution and delivery of this Agreement, the Settlement Agent has conducted the Investment Signing, at which you have:

(a) Executed and delivered to the Settlement Agent originals of the following documents (each as well as other documents completed and delivered in connection with the consummation of the transactions contemplated by this Agreement an "**Investment Document**", and together the "**Investment Documents**"):

(i) this Agreement;

(ii) the Investment Term Sheet;

(iii) a notarized Mortgage and Security Agreement, substantially in the form set forth in Exhibit B, which is attached and made a part of this Agreement (the "**Security Instrument**");

(iv) a Notice of Right to Cancel, substantially in the form as set forth in Exhibit C, which is attached and made a part of this Agreement; and

(v) a signed and completed Insurance Request and Authorization Form granting authorization for Hometap to be added as a loss payee (or as we otherwise direct) on all of Owner's insurance policies for the Property.

(b) Received the Signing Instructions prepared and provided by the Settlement Agent based upon the Investment Term Sheet, which shall set forth the use and disbursement of the Investment Amount (the "**Signing Instructions**"); and

(c) Provided the Settlement Agent any other documents and information we reasonably request to have completed the Investment Signing and secure and perfect the Option and related documents as a lien upon the Property.

Section 1.3 Right to Cancel.

(a) You have a right to rescind and cancel this Agreement ("**Right to Cancel**") by delivering written notice to us at any time prior to 11:59 p.m. Eastern Time on the third (3rd) Business Day following the Signing Date (the "**Cancellation Period**") of your exercise of your Right to Cancel.

(b) If you exercise your Right to Cancel during the Cancellation Period, then this Agreement shall become null and void and of no further legal effect or consequence, the Investment Amount shall be returned to Hometap, and you and Hometap shall have no further obligations to one another.

(c) If you do not exercise your Right to Cancel during the Cancellation Period, then upon expiration thereof, this Agreement shall become binding and effective upon the parties at 12:00 a.m. Eastern Time on the first Business Day following the Cancellation Period (the "**Effective Date**").

(d) For purposes of this Agreement, a "**Business Day**" shall be all calendar days except Sundays and any day that is a federal banking holiday in the United States.

Section 1.4 Disbursement of Funds and Recording of Documents. Upon the Effective Date:

(a) Disbursement of Investment Amount and Net Investment Amount. Hometap shall cause the Investment Amount to be disbursed by the Settlement Agent in accordance with the Settlement Instructions, and the Net Investment Amount shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable on or following the Effective Date.

(b) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the Security Instrument, as well as any other documents evidencing the satisfaction of liens or encumbrances on the Property as a result of the payments made pursuant to the Signing Instructions with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file the Security Instrument and any related documents.

Section 1.5 Option Period. The term of the Option (the "**Option Period**") shall commence on the Effective Date and shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the tenth (10th) anniversary of the Effective Date (the "**Expiration Date**"); *provided, however*, that Hometap may extend the Option Period one or more times by up to a total of an additional ten (10) years, by providing you with written notice (an "**Extension Notice**") of our intent to extend the Option Period prior to the Expiration Date or the conclusion of any Extension Period (as defined below). Any Extension Notice shall include the period for which Hometap intends to extend the Option Period (such period being the "**Extension Period**", and the Option Period and any Extension Period collectively being the "**Effective Period**"), and upon any such extension, the Expiration Date shall be accordingly extended to the last day of any Extension Period. The Extension Period shall continue until the earlier of (a) an Owner Repurchase (as defined below), (b) a Hometap Option Exercise (as defined below), or (c) 11:59 p.m. Eastern Time on the last day of the Extension Period.

## SECTION 2
## OPTION CONDITIONS

Section 2.1 Determination of Ending Home Value. The "**Ending Home Value**" shall be (i) determined by the Appraisal Process (as defined below in Section 2.3) or (ii) in the event of a Permitted Sale (as defined

below in Section 2.6(a)), the sale price of the Property, provided that such price is at least ninety percent (90%) of the value of the Property determined by the Appraisal Process.

Section 2.2 Calculation of the Hometap Share. The "**Hometap Share**" represents the value of Hometap's interest in the Property by virtue of the Option and shall be determined by multiplying (a) the Hometap Percentage, as set forth in the Investment Term Sheet, by (b) the Ending Home Value; *provided, however*, that the Hometap Share shall not exceed an amount equal to an annualized rate of return of twenty percent (20%) on the Investment Amount ("**Hometap Cap**"), as further described in the Investment Term Sheet.

Section 2.3 Appraisal Process.

(a) Physical Appraisal. For purposes of this Agreement, a "**Physical Appraisal**" shall mean a physical inspection and appraisal of the Property that meets the following criteria:

(i) the appraiser will be selected by us or approved in advance by us;

(ii) the appraiser must be unaffiliated with either you or us or any other individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government, or any agency or political subdivision of any of the foregoing (each a "**Person**") with an interest in the Property, such as a potential third-party buyer;

(iii) the inspection and appraisal of the Property must be done in compliance with the Uniform Standards of Professional Appraisal Practice; and

(iv) the Owner shall be responsible for payment of Appraisal costs.

(b) Second Physical Appraisal. In any circumstance where the Ending Home Value is being determined by an Appraisal under the terms of this Agreement, either the Owner or Hometap shall have the right to order and complete a second Physical Appraisal. If either party desires to have a second Physical Appraisal, then (a) the second Physical Appraisal must be completed (not just requested or ordered) within thirty (30) days after receiving final results of the first Appraisal and at least ten (10) Business Days before any scheduled closing or settlement, and (b) the Ending Home Value will then be the average of the value of the two Appraisals. Notwithstanding anything in this Agreement to the contrary, the party requesting a second Physical Appraisal shall bear the costs associated with such second Physical Appraisal. The process of undertaking and completing one or two Appraisals under this Agreement shall be referred to as the "**Appraisal Process**".

(c) Alternative Appraisal. Notwithstanding the requirements of Section 2.3(a) above, Hometap may elect to utilize an alternative method of appraisal (an "**Alternative Appraisal**") in lieu of a Physical Appraisal and such Alternative Appraisal shall be deemed binding for all purposes under this Agreement as if such Alternative Appraisal was a Physical Appraisal, subject to the rights of the Owner or Hometap to request a second Physical Appraisal pursuant to Section 2.3(b) above.

(d) Appraisal. For purposes of this Agreement, the singular or plural term "**Appraisal**" shall include, in Hometap's sole discretion, either a Physical Appraisal as defined in Section 2.3(a) or an Alternative Appraisal as defined in Section 2.3(c).

(e) Cooperation. Each party agrees to comply with the Appraisal Process and cooperate in good faith with any third-party vendors so that the Physical Appraisal(s) may be completed in a timely and effective manner.

(f) Notice. If applicable, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share within ten (10) Business Days after completion of the Appraisal Process.

(g) Cost of Physical Appraisals. You will pay all reasonable costs and expenses associated with any Physical Appraisal ordered, scheduled, or conducted in accordance with the terms of this Agreement.

Section 2.4 Owner Repurchase.

(a) Owner Right to Repurchase. The Owner shall have the right to repurchase the Option (an "**Owner Repurchase**") from Hometap in the amount of the Hometap Share in accordance with the terms and conditions of this Agreement.

(b) Repurchase Notice. You may elect to complete an Owner Repurchase at any time during the Effective Period, regardless of whether a Transfer is contemplated, by delivering to us written notice (a "**Repurchase Notice**"). Within fifteen (15) Business Days of our receipt of a Repurchase Notice, we shall have the right to conduct the Appraisal Process, at your cost, and determine the Ending Home Value for purposes of calculating the Hometap Share. Within ten (10) Business Days after completion of the Appraisal Process, Hometap shall deliver to you written notice of the Ending Home Value and the Hometap Share and schedule a settlement of the Owner Repurchase (the "**Repurchase Settlement**").

(c) Confirmation of Title. Upon receipt of your Repurchase Notice, we may request, as evidenced by a completed title report, at your cost, confirmation of good and marketable title in and to the Property in fee simple and free of any Liens and Encumbrances (as defined below in Section 2.6(a)(iii)), subject only to the Permitted Encumbrances (as defined below in Section 2.6(a)(iii)), to be provided in the form either (i) of a policy of title insurance issued to, or for the benefit of, Hometap and insuring our rights under the Investment Documents; or (ii) of a written title report, abstract of title, or other title search documentation reflecting, to our satisfaction, confirmation of good and marketable title to the Property (either such form of confirmation being "**Confirmation of Title**").

(d) Transfer. In the event of a Transfer (as defined below in Section 2.5(a)), you agree to follow all procedures set forth below in Section 2.6 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.6 shall control.

(e) Expiration. In the event of the Expiration Date, you agree to follow all procedures set forth below in Section 2.7 in addition to those provided herein in Section 2.4. Should any procedures be inconsistent, those procedures in Section 2.7 shall control.

(f) Sufficiency of Tender. Hometap retains the right to reject any tender by you of the Hometap Share payment where we believe your tender is not for the full amount of the Hometap Share, is not actually received by us, is not tendered within the time frame agreed to by you and us, or is subject to any legal limitation.

(g) Termination of Option. Upon our receipt of the Hometap Share payment, the Option shall be terminated, and we will have no further right to exercise the Option or have any further interest whatsoever in the Property. After our receipt of the Hometap Share (together with any other amounts owed by Owner to Hometap under the terms of this Agreement), we will terminate and release the Security

Instrument and deliver any other documents reasonably required to verify the termination of the Option and release of the Security Instrument. Owner will be responsible for all Transfer Closing Costs as defined and set forth in Section 2.6(d)(iv) below.

Section 2.5 Hometap Right to Exercise Option. Unless and until you elect and complete an Owner Repurchase, Hometap shall have the right to exercise the Option (a "**Hometap Option Exercise**"), as provided for below in Section 3.1, only upon any of the following events or occurrences during the Effective Period:

(a) any Permitted Sale (as defined below in Section 2.6(a)), or other sale, exchange, transfer, conveyance, or assignment of all or any part of the Property or any legal or beneficial interest in the Property (any such occurrence being a "**Transfer**"), as provided below in Section 2.6; *provided, however*, that any Transfer to a surviving Owner or estate of an Owner in the event of a death of an Owner shall not trigger a Hometap Option Exercise;

(b) on or in anticipation of the Expiration Date, as provided below in Section 2.7;

(c) upon an Event of Default, as provided below in Section 7;

(d) upon destruction of the Property as provided below in Section 6.1(d);

(e) upon condemnation of the Property, as provided below in Section 6.1(h); or

(f) upon the mutual agreement of Hometap and Owner.

Section 2.6 Event of Transfer.

(a) Permitted Sale. For purposes of this Agreement, a "**Permitted Sale**" shall mean a Transfer of the Property that meets the following conditions as determined in Hometap's sole reasonable discretion:

(i) the Transfer must be a transaction entered into in good faith without fraud or deceit carried out by unrelated or unaffiliated parties, by a willing buyer and a willing seller, each acting in his or her own self-interest, in which the sale price represents fair market value of the Property (an "**Arm's Length Transaction**"); *provided, however*, that an Arm's Length Transaction does not include any of the following: (A) a transaction between family members or business associates at less than fair market value of the Property, (B) a transaction subject to hidden terms or agreements or special understandings between the parties, whether written or oral (for example, the seller to regain ownership of the Property or the buyer to resell the Property and the seller to receive any proceeds from the resell transaction), or (C) a Transfer in which the sale price of the Property is less than ninety percent (90%) of the fair market value as determined by an Appraisal;

(ii) the terms and conditions of an Arm's Length Transaction will be set forth in a commercially reasonable standard form of Agreement for the Purchase and Sale of Real Property (a "**P&S**") prepared and negotiated by legal counsel with experience in such matters; and

(iii) you must convey title free and clear of any and all (A) licenses, easements, equitable servitudes, public bond obligations, and other conditions, covenants, restrictions and rights to which the Property is subject (collectively, "**Liens and Encumbrances**"), except for those: (1) that are stated as exceptions in the Confirmation of Title, or (2) to which we have expressly agreed in writing that the Property will remain subject (such excepted Liens and Encumbrances being "**Permitted Encumbrances**"), and (B) loans or other obligations, the payment or

performance of which is secured by a lien on the Property (such items being "**Senior Liens**"), including any loans or other obligations owed to any creditor or third-party vendor.

(b) Notices and Documentation upon Proposed Transfer. In connection with any Transfer, the Owner agrees as follows:

(i) Permitted Sale: Owner Notice of Binding Offer. In the event of a Permitted Sale, Owner shall provide Hometap written notice (a "**Binding Offer Notice**") of any binding offers to Transfer the Property to any Person who proposes to purchase the Property (a "**Third-Party Buyer**"). Such Binding Offer Notice must be delivered within three (3) Business Days of receiving such binding offer and, in any event, no less than thirty (30) days prior to the proposed closing date for such Permitted Sale. Any binding offers shall be in form and substance that are typical of real property purchases and sales for the state in which the Property is located and shall be required to include terms and conditions evidencing an Arm's Length Transaction. A Binding Offer Notice shall include a full and complete copy of the binding offer, which must include the name of the Third-Party Buyer, the sale price, the proposed closing date for the Permitted Sale, the proposed inspection date, if any, and any and all other material terms and conditions of the proposed Permitted Sale, including, without limitation, any financing or mortgage contingencies. The Binding Offer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Permitted Sale.

(ii) All Other Transfers: Owner Notice of Transfer. In the event of any Transfer other than a Permitted Sale, Owner shall provide Hometap written notice (a "**Transfer Notice**") no less than thirty (30) days prior to the closing date for such Transfer. A Transfer Notice shall include a full and complete copy of the documents governing the Transfer, which must include the name of the transferee, the sale price (if any), the proposed closing date for the Transfer, the proposed inspection date (if any), and any and all other material terms and conditions of the proposed Transfer, including, without limitation, any financing or mortgage contingencies. If the Owner intends for the Transfer to be an Exempted Owner Assignment (as defined below in Section 8.9(b)) or an Exempted Owner Property Transfer (as defined below in Section 8.9(c)), the Owner shall provide any additional necessary documentation in the Transfer Notice. The Transfer Notice must also indicate whether the Owner intends to complete an Owner Repurchase prior to, or simultaneous with, the closing of the Transfer.

(iii) Notice of Hometap Option Exercise upon a Transfer. Following receipt of a Binding Offer Notice or a Transfer Notice in which you do not elect to exercise your right to an Owner Repurchase, and prior to the closing of the proposed Transfer contemplated by such Binding Offer Notice or Transfer Notice, Hometap shall have the right to complete a Hometap Option Exercise, as further described in Section 3.1, by delivering to you a written notice (an "**Exercise Notice**") of our intent to do so. Upon receipt of an Exercise Notice, you (A) shall not consummate any closing of the Transfer unless and until Hometap has completed its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property, and (B) shall promptly, and in no event more than two (2) Business Days from receipt thereof, provide Hometap all documents, binding offers, escrow instructions, preliminary title reports, and any other materials and information relating to the proposed Transfer that become available. Following receipt of such materials, Hometap shall use commercially reasonable efforts to complete its Hometap Option Exercise and all actions deemed necessary or advisable by Hometap to document its interest in the Property prior to any closing of a Transfer.

(c) Appraisal Process upon Transfer. Within fifteen (15) Business Days of receiving notice of your election to exercise the Owner Repurchase or our delivering you an Exercise Notice, we may undertake the Appraisal Process and conduct an Appraisal.

(d) Transfer Closing. Any Transfer shall be completed through a closing process (the "**Transfer Closing**") that is commercially reasonable and follows standard practices and procedures for the purchase and sale of real property in the state in which the Property is located, including without limitation using the services of a Settlement Agent. The Owner shall provide written notice (the "**Transfer Closing Notice**") to Hometap promptly, and in any event no later than ten (10) Business Days prior to the date of the Transfer Closing. The Transfer Closing Notice shall include the proposed date of the Transfer Closing, and any and all relevant documents related to such Transfer Closing, including written settlement instructions, identification and acknowledgement of an Owner Repurchase or Hometap Option Exercise, and instructions for the payment of the Hometap Share. Hometap shall have the right to (A) review and provide input on any such settlement instructions and (B) have a representative attend the Transfer Closing. The Owner acknowledges and agrees that the completion of an Owner Repurchase or Hometap Option Exercise shall be concurrent with a Transfer Closing.

(i) Transfer Closing Deliverables. On or prior to a Transfer Closing where there will be an Owner Repurchase or a Hometap Option Exercise, you agree to deliver to the Settlement Agent the appropriate deeds, affidavits, certificates, notices, and other documents required by law, the Settlement Agent or us, in form satisfactory to us, to effect the Owner Repurchase or the Hometap Option Exercise.

(ii) Payment Allocations. At any Transfer Closing where there will be an Owner Repurchase, the Owner shall be responsible for paying Hometap the Hometap Share, as well as any Transfer Closing Costs (as defined below in Section 2.6(d)(iv)).

(iii) Termination and Release by Hometap at Transfer Closing. Within ten (10) Business Days of any Transfer Closing, and contingent upon our receipt of the Hometap Share funds, we will submit the documents necessary to terminate and release the Security Instrument.

(iv) Transfer Closing Costs. Owner shall pay all costs in connection with a Transfer Closing or Repurchase Settlement including, without limitation, recording fees and costs, reconveyance fees, lien release fees, escrow fees, title insurance fees, federal, state, local and documentary transfer taxes ("**Transfer Closing Costs**") and all sales commissions ("**Sales Commissions**"). Transfer Closing Costs and Sales Commissions shall be paid from the amounts that are owed to Owner and not from any amounts that are owed to Hometap; *provided, however*, that Owner shall pay Hometap directly for any Transfer Closing Costs or Sales Commissions incurred by Hometap and as detailed on the settlement instructions provided by Hometap to Owner.

Section 2.7 Event of Expiration Date.

(a) In the event that the Option remains in effect and has not been, nor is the subject of, a Hometap Option Exercise or Owner Repurchase, then (i) the Owner has the right to complete an Owner Repurchase as of the Expiration Date, and (ii) Hometap shall have the right to complete a Hometap Option Exercise as of the Expiration Date (either an Owner Repurchase as of the Expiration Date or a Hometap Option Exercise as of the Expiration Date being an "**Expiration Settlement**"), each implemented by delivering written notice to the other party (either a Repurchase Notice or Exercise Notice, as appropriate) prior to the Expiration Date.

(b) Any Owner Repurchase or Hometap Option Exercise shall follow the procedures, terms, and conditions of Section 2.4 and Section 3.1, respectively. Should any provisions be inconsistent, those provisions of this Section 2.7 shall control.

(c) If we are not satisfied with the Ending Home Value following the Appraisal Process, or with the Confirmation of Title, we may withdraw or reject the Expiration Settlement without any penalty to us, and extend the Effective Period as provided in this Agreement.

## SECTION 3
## EXERCISE OF OPTION; OTHER TERMINATION OF OPTION

Section 3.1 Exercise of Option. Only upon the occurrence of any of the events identified in Section 2.5 above, Hometap shall have the right to exercise the Option as described in this Section 3.1. Exercise of the Option shall allow Hometap to acquire a percentage possessory ownership interest in the Property equivalent to the Hometap Percentage at the time of exercise.

(a) Exercise Notice. Upon our election to exercise our right to a Hometap Option Exercise, we shall provide you with an Exercise Notice at least thirty (30) days prior to the anticipated date for closing the Hometap Option Exercise ("**Exercise Closing**"). The Exercise Notice shall specify the Exercise Closing date, the Exercise Payment (as defined below in Section 3.1(e)), written settlement instructions, and instructions for release of the Security Instrument upon completion of the Hometap Option Exercise.

(b) Hometap Ownership. In Hometap's sole discretion, we may implement the Hometap Option Exercise by (i) taking joint ownership of the Property with you and (ii) soliciting a Transfer of the entire Property, including your interest, to one or more Third-Party Buyers, and receiving the Hometap Share and the Exercise Payment in connection with such Transfer. Hometap's ownership of the Property shall be a percentage possessory interest in the Property equivalent to the Hometap Percentage at the time of the Hometap Option Exercise. If Hometap takes joint ownership of the Property, the legal form of such joint ownership will be decided by us, which may include a trust with you and us as beneficiaries.

(c) Owner Repurchase. After receiving the Exercise Notice, you may exercise your right to elect an Owner Repurchase pursuant to Section 2.4 above; *provided that* (i) you deliver a Repurchase Notice to Hometap at least twenty (20) days before the Exercise Closing date; (ii) the Repurchase Settlement must (A) occur (1) within fifteen (15) days of you providing us with a Repurchase Notice, and (2) prior to any scheduled Exercise Closing, and (B) use an Ending Home Value that is the value of the Property as determined by an Appraisal. If you elect to make an Owner Repurchase but the Repurchase Settlement is not completed within the prescribed periods in this Section 3.1(c), then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise.

(d) Exercise Closing. You agree to take any reasonable actions and sign any documentation deemed necessary or desirable by Hometap to allow Hometap to complete the Hometap Option Exercise, including without limitation participating in an Exercise Closing, and to effect our Hometap Percentage possessory interest in the Property.

(e) Disbursement of Exercise Closing Payment. In consideration for the Hometap Percentage possessory interest in the Property, Hometap shall issue a payment to you in the amount of one percent (1%) of the Investment Amount ("**Exercise Payment**"). Hometap shall cause the Exercise Payment to be disbursed by the Settlement Agent in accordance with the Exercise Notice, and the Exercise Payment shall be delivered and paid to the Owner via wire transfer or check, as instructed by the Owner, as soon as reasonably practicable at or following the Exercise Closing.

(f) Recording of Documents. Hometap shall use commercially reasonable efforts, via the Settlement Agent, to record and file the any documents evidencing the Hometap Option Exercise and the Hometap Percentage possessory interest in the Property with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated. You agree to take any reasonable actions and sign any additional documentation deemed necessary or desirable by Hometap to allow Hometap to record and file such documents.

(g) Transfer Following Hometap Option Exercise.

(i) Occupancy. Prior to a Transfer, you will retain physical possession and the exclusive right to occupy the Property (except if we determine that the Property is at risk of waste or gross neglect, in which case we will have discretionary rights of entry or possession solely in order to preserve and maintain the Property).

(ii) Initiation of Transfer by Owner. If you intend to initiate a Transfer, such Transfer shall meet the conditions of a Permitted Sale as described above in Section 2.6(a). Furthermore, you agree to comply with the requirements of Section 2.6 in completing the Transfer.

(iii) Initiation of Transfer by Hometap. If we choose to initiate a Transfer, we will provide you with written notice at least ten (10) Business Days prior to soliciting buyers and transferring the Property to one or more third parties in a Transfer. You will cooperate by allowing access to the Property and promptly executing all documents presented to you by us to effect a Transfer of your interest in the Property to the Third-Party Buyer.

(iv) Ending Home Value and Payment of the Hometap Share. In any Transfer following a Hometap Option Exercise, the Ending Home Value will be the sale price of the Property. At the Transfer Closing for such Transfer, the sale proceeds will be allocated and paid in the manner described in this Section 3.1 and above in Section 2.6(d)(ii), and we will be paid (A) any Transfer Closing Costs that we paid as further detailed in Section 2.6(d)(iv) and (B) any other amounts paid by us related to the preparation, marketing, or sale of the Property.

Section 3.2 Non-Exercise; Other Terminations of Option. Subject to the continuing duties, rights, and obligations of the parties in this Agreement, the Option will terminate under the following conditions if there has not been a prior Owner Repurchase or Hometap Option Exercise:

(a) upon a Permitted Sale for which we received a Binding Offer Notice, as provided above in Section 2.4(b)(1), and we affirmatively elected not to exercise the Option and complete a Hometap Option Exercise;

(b) we elect not to complete a Hometap Option Exercise as of the Expiration Date and allow the Option to lapse as of the Expiration Date;

(c) the Property is destroyed and the insurance proceeds and proceeds of any sale of the Property are paid to us in the full amount specified below in Section 6.1(d);

(d) the Property is condemned, in whole and not in part, and the condemnation proceeds are paid to us in the full amount specified below in Section 6.1(h); or

(e) we voluntarily terminate the Option in a written notice delivered by us to you.

Section 3.3 Effect of Non-Exercise and Termination. If the Option is terminated as provided above in Section 3.2, then:

(a) the Option and our rights to exercise the Option will immediately terminate;

(b) the Investment Amount will be retained by you in consideration for the Option;

(c) subject to any survival provisions, this Agreement and any and all the other Investment Documents will terminate and be of no further legal force or effect; and

(d) we will execute, acknowledge, deliver to you, and record and file with the appropriate county recorder or other applicable governmental, city, county, or municipal office in which the Property is situated a release and/or reconveyance of the Security Instrument, and any other documents reasonably required to verify the termination of the Option and the Investment Documents; *provided, however*, that certain obligations and provisions of this Agreement will survive such termination as provided below in Section 8.10.

## SECTION 4
## OWNER REPRESENTATIONS AND WARRANTIES

Section 4.1 Owner Representations and Warranties. The truth, accuracy, and completeness of the representations and warranties set forth in this Section 4.1 are a condition precedent to any of Hometap's obligations under each of the Investment Documents. The Owner hereby represents and warrants to Hometap as of the Effective Date, and hereby renews and reiterates such representations and warranties upon any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Title to Property. You, as Owner(s) identified in this Agreement, individually and collectively, appear on record title of the Property as holding fee simple title to 100% of the Property. There are no other Persons who have a claim to any title to the Property, and all Owners are identified in this Agreement. Your fee simple title to the Property is marketable and insurable, free of any Liens and Encumbrances, except for any Permitted Encumbrances, and there are no additional existing or pending Liens and Encumbrances, or any other claims, restrictions, or other interests against the title to the Property.

(b) Capacity and Authority. You have the full capacity and the legal power, right, and authority to grant the Option, to enter into this Agreement and the other Investment Documents, and to consummate the transactions contemplated hereby and thereby.

(c) Trust. If you are the Trustee of a Revocable Trust: (a) the trust has been duly formed; (b) the Trustees of the trust have the capacity and authority to enter into this Agreement and the other Investment Documents; and (c) true, accurate, and complete copies of all trust documents (and all amendments and supplements) have been delivered to us. For purposes of this Agreement, a "**Revocable Trust**" shall mean a revocable trust, revocable living trust, inter vivos trust, revocable family trust or similar trust established in accordance with the laws of any state.

(d) No Lawsuits, Claims, Bankruptcy, or Foreclosures. There is no litigation or arbitration pending, or to your knowledge, threatened against you relating to your ownership of the Property or that might adversely affect your title to the Property, the Property itself, the value of the Property, the Hometap Share, Hometap's rights herein, or your ability to perform your obligations under this Agreement. You have not received nor are you aware of any: (a) special assessment or other proceedings affecting the Property; (b) default or notice of default with respect to any loan or other obligation secured by the Property;

(c) notice of sale with respect to any lien or deed of trust or mortgage (as appropriate) on the Property; or (d) information or notice that the Property is to be sold or foreclosed upon by a Person holding a lien on the Property.

(e) No Violations. There are no violations of, or claims of violation of, any laws, regulations, zoning ordinances or other land-use regulations relating to the Property and all operations or activities upon, or use or occupancy of the Property or any portion of the Property, by you or others comply with law, including local laws and zoning ordinances.

(f) Environmental Matters. To your knowledge, there are no violations of, or claims of violation of, any state, federal, or local environmental law or regulation relating to the Property, including those concerning hazardous materials ("**Environmental Laws**"). To your knowledge, no hazardous materials are present on, in, or about the Property or property in the vicinity of the Property. You will not, and will not allow others to, violate any laws, including, without limitation, Environmental Laws, relating to the Property or perform any activities upon, or use or occupy the Property or any portion of the Property, in any manner that violates any laws, including, without limitation, Environmental Laws.

(g) Documentation and Information Supplied by Owner; Financial Condition of Owner. Your application to us and all financial and other documentation and other information supplied or made available by you or your spouse or co-owner, if applicable, as part of applying for, or in connection with entering into, this Agreement, the Option, and the Investment Documents is truthful, complete, not misleading, and fairly and accurately reflects your (and, if applicable, your spouse's or co-owner's) financial condition as of (a) the date supplied and (b) the Effective Date. There has been no material change in your financial condition as of the Effective Date since your application to us. To your knowledge, there has not been any change in the condition or value of the Property since the date of any Appraisal conducted prior to the Effective Date.

(h) New Debt or Obligations. Since the date on which you initiated discussions with Hometap, you have not incurred (or agreed to incur) any additional obligations with respect to the Property such as additional debt or other investments in the equity or appreciation of the Property, nor have any additional liens been placed (or, to your knowledge, will be placed) on the Property, in each case other than where you have provided written notification to Hometap of such debt, obligations, or liens.

(i) Not a Loan. You acknowledge and understand that the payment of the Investment Amount by Hometap is not a loan or any other form of financing transaction, swap, or futures contract. Under no circumstances will the Investment Amount accrue interest, and if the Option expires, then you will not be obligated to return or repay the Investment Amount.

(j) Conflict; Enforceability. The execution, delivery, and performance of the Investment Documents will not conflict with, or result in a breach of, any of the terms, conditions, or provisions of, or constitute a default under, any note or other evidence of indebtedness or any contract, indenture, mortgage, deed of trust, loan, agreement, lease, or other agreement or instrument to which you are a party or by which the Property may be bound. The Investment Documents and all other documents required to be executed by you in connection with those documents are and will be valid, legally binding obligations of, and enforceable against, you and any successors or permitted assignees in accordance with their terms.

## SECTION 5
## HOMETAP REPRESENTATIONS AND WARRANTIES

Section 5.1 Hometap Representations and Warranties. Hometap hereby represents and warrants to the Owner as of the Effective Date, and hereby renews and reiterates such representations and warranties upon

any consummation of a Hometap Option Exercise or Owner Repurchase as provided for in this Agreement, as follows:

(a) Authority. Hometap is a duly established and organized Delaware limited liability company, is in good standing in all jurisdictions in which it is qualified to do business, and is duly authorized to execute and deliver this Agreement, to enter into transactions contemplated hereunder, and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery, and performance.

(b) Enforceability. Hometap's obligations under this Agreement and any related agreement to which it is a party constitute its legal, valid, and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

## SECTION 6
## COVENANTS

Section 6.1 Owner Covenants. During the Effective Period, the Owner hereby agrees to comply with and satisfy and observe the following covenants:

(a) Maintain Mortgage, Liens and Encumbrances and Other Secured Obligations. You shall (i) maintain, pay, keep current, and comply with any and all obligations, maintenance requirements, and covenants under your primary mortgage and any and all other mortgages, loans, and obligations that are senior to the lien established by the Security Instrument, the covenants running with the land under this Agreement, and the Option, of which (A) we have actual written notice under a title report, title search, or title commitment obtained in connection with this Agreement and the transaction related thereto, and (B) that are acknowledged in writing by us before or upon our execution of this Agreement (each an "**Acknowledged Pre-Existing Lien**"), and you shall notify Hometap promptly in writing of any defaults or potential or pending defaults thereunder; and (ii) at all times keep the Property free of any and all Liens and Encumbrances, except for (A) Acknowledged Pre-Existing Liens, (B) Permitted Encumbrances, and (C) Approved Subsequent Loans (as defined below in Section 6.1(i)(ii)).

(b) Owner Occupied; Right of Occupancy. During the Effective Period, the Owner (or at least one Owner if there are multiple Owners) shall occupy the Property as Owner's principal place of residence ("**Owner Occupied**") other than during periods of vacancy no longer than ninety (90) days due to renovation. In the event you desire for the Property to no longer be Owner Occupied, you must request such change in writing from Hometap, which shall be approved or denied in Hometap's sole discretion. You will enjoy continuous right of occupancy of the Property as an owner, and not as a tenant or lessee, whether or not we have completed a Hometap Option Exercise, subject to the rights of you and Hometap to Transfer the Property pursuant to the terms of this Agreement. Your sole right of occupancy will be effective only so long as you do not Transfer or attempt to Transfer the Property except as permitted under this Agreement. Your sole right of occupancy is not transferable by you except as part of a Permitted Sale or Exempted Owner Property Transfer, or as otherwise permitted by us.

(c) Maintain Adequate Insurance Coverage. You will keep the Property and all buildings or other customarily insured improvements upon the Property insured by a nationally recognized insurer acceptable to us against loss by fire, hazards of extended coverage, other hazards common for similar properties in similar locations, and other hazards we may request, in an amount equal or greater than the full insurable value of the Property, but in no event less than the minimum amount necessary to fully compensate for any damage or loss on a replacement cost basis. All such insurance policies will name us

and our successors and assigns as a loss payee (or as we otherwise direct). If the Property is or becomes located in an area identified on a flood hazard map or flood insurance rate map issued by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy meeting the requirements of the guidelines of the Federal Insurance Administration is and will be in effect, which policy is and will be issued by a nationally recognized insurer acceptable to us and provide coverage in an amount equal to not less than the lesser of the full insurable value of the Property or the maximum amount of insurance available under the National Flood Insurance Act of 1968. All such flood insurance policies will name us and our successors and assigns as a loss payee (or as we otherwise direct). You will timely pay all premiums for all such insurance policies and, if you fail to do so, we are authorized to maintain and/or obtain such policies at your cost and expense, and you will immediately reimburse us for such costs and expenses. Hometap is under no obligation to purchase any particular type or amount of coverage. As such, coverage shall cover Hometap but may not protect Owner, Owner's equity in the Property, or the contents of the Property and might provide greater or lesser coverage than was previously in effect. You shall provide written evidence of your compliance with the above at any and all signings, closings, and settlements conducted under this Agreement, or as Hometap may reasonably request from time to time.

(d) Destruction or Loss of Property.

(i) Repair and Restoration. If the Property is destroyed or experiences material damage, you will restore or repair the Property to at least the same condition and characteristics as of the time immediately preceding the destruction or damage, subject to all applicable local ordinances. Except to the extent you are required to take other action in connection with any Senior Lien on the Property, you will apply any insurance proceeds to the restoration or repair. If the insurance proceeds are insufficient to complete the restoration or repair, you will be responsible for any shortfall and we will have no responsibility or obligation to pay any amount whatsoever in connection with the restoration or repair of the Property.

(ii) Allocation Where Repair Not Feasible. If any loss occurs in connection with the Property, and restoration or repair is not economically feasible, you will obtain a Physical Appraisal, *provided that* the appraiser will be instructed to determine the value of the Property as it existed immediately prior to the destruction or damage. Any insurance proceeds, whether or not the underlying insurance was required by us, will be allocated in the following order: (A) to the payment (or reimbursement) of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you, any lender of a Senior Lien, and/or Hometap in collecting and contesting with the insurers the payments under the insurance policies; (B) to payment of any Senior Lien, *provided that*, if the insurance proceeds equal or exceed the amount owed under any Senior Lien, such payment will result in the discharge of any related Senior Lien; (C) to us, an amount equal to the Hometap Share; and (D) to you, the balance of the proceeds.

(e) Physical Appraisals. In connection with any Physical Appraisal, you will cooperate with the appraiser by granting full access to the Property at reasonable times and by making available any relevant documents in your possession pertaining to conditions that may affect the value of the Property. You will immediately share with us any written Physical Appraisal you receive related to this Agreement.

(f) Renovation.

(i) Owner shall be entitled, in your sole discretion to renovate, modify, or otherwise make physical alterations to the Property (a "**Renovation**"), *provided that* any such Renovation is completed by licensed contractors in accordance with local zoning laws and regulations, properly permitted, and only upon receipt of any approvals from any local, municipal, or state authorities. If the Owner undertakes a single Renovation project with documented aggregate costs in excess of

$25,000, then the Owner may provide written notice (a "**Renovation Notice**") to Hometap within ninety (90) days following the completion of such Renovation. The Renovation Notice will include: (A) a summary describing the Renovation, (B) photographs of the Property prior to and following the Renovation, (C) copies of all contracts, invoices, permits, and other documentation associated with such Renovation, (D) all material terms and information describing the Renovation, and (E) any other information relating thereto that Hometap may reasonably request.

(ii) In connection with an Owner Repurchase, the Owner may request and Hometap may, in its sole discretion, accept an adjustment to the Ending Home Value to account for any appreciation in the value of the Property resulting from the Renovation. In connection with such a potential Renovation adjustment at the time of an Owner Repurchase, Hometap shall complete an Appraisal at Owner's expense, and such Appraisal shall include a determination of the increase in the Ending Home Value attributable exclusively to the Renovation (the "**Renovation Value Increase**"). If accepted by Hometap, in its sole discretion, the amount of the Renovation Value Increase shall be deducted from the Ending Home Value for purposes of calculating the Hometap Share; *provided, however*, that the Renovation Value Increase shall not exceed the actual cost of the Renovation as evidenced and documented in the Renovation Notice; *and further provided* that the Renovation Value Increase shall not exceed the difference between the Ending Home Value and the Beginning Home Value.

(g) Option Fees. You will pay any reasonable fees imposed or incurred by us from time to time related to the Option during the Effective Period (such fees being referred to as "**Option Fees**"), which may include, without limitation: (i) fees for processing your requests for subordination; (ii) fees for processing your requests for Property title or ownership changes; (iii) fees for processing any reconveyance or renewal recordings of any Security Instrument or other documentation pertaining to the Option; (iv) fees for processing Hometap Cure Payments (defined below in Section 7.2(a)); (v) fees relating to any Event of Default (defined below in Section 7.1), including any fees, costs, or expenses for our oversight of the default process; (vi) fees incurred in any dispute relating to the Property; and (vii) charges to cover any third-party or other out-of-pocket costs relating to any of the foregoing (including charges imposed by title companies and escrow companies, charges related to recording of documents, and attorneys' fees).

(h) Condemnation. If the Property is condemned in whole or in part during the Effective Period, then all condemnation proceeds net of reasonable costs and expenses (including attorneys' fees that have been approved by us) reasonably incurred by you and/or us in collecting and contesting the condemnation proceeds ("**Net Condemnation Proceeds**") will be allocated as provided above in Section 6.1(d)(ii). If the Property is condemned in part, then the Hometap Share shall be calculated using the Net Condemnation Proceeds as the Ending Home Value, and such proceeds will be allocated in the order provided above in Section 6.1(d)(ii). In the case of a partial condemnation, the Option will be retained with respect to any portion of the Property that has not been condemned.

(i) Allowed Loans and Transactions.

(i) Minimum Owner Equity. Owner may not at any time increase, or permit the increase of, the total balance of loans or other property interests secured by liens on the Property (including for such purposes the unused portion of any committed line of credit) if such additional debt or property interest would reduce Owner's remaining Owner Equity (as defined below) in the Property below the dollar amount equal to the "**Minimum Owner Equity**", which is twenty percent (20%) of the current appraised value of the Property (the "**Current Property Value**"). "**Owner Equity**" shall be defined as the amount calculated by subtracting from the Current Property Value: (1) all Acknowledged Pre-Existing Liens, (2) all Approved Subsequent Loans (as defined below), (3) the present value of the Hometap Share (assuming Ending Home Value higher than Beginning

Home Value); *provided, however*, that for purposes of this calculation the Hometap Cap shall not apply, and (4) any other debt or obligations secured by the Property.

(ii) Approved Subsequent Loans.

(1) In order for Hometap to consider any request by Owner to incur any additional indebtedness secured by a lien on the Property (an "**Approved Subsequent Loan**"), Owner shall provide Hometap with all documentation relating to such proposed Approved Subsequent Loan that Hometap may reasonably request, including, without limitation, any commitment letter, offer letter, term sheet, proposed note, preliminary title report, appraisal, or inspection report, as well as any similar documentation relating to any Acknowledged Pre-Existing Liens.

(2) If the proposed Approved Subsequent Loan would result in a lien (or modification or increase of an Acknowledged Pre-Existing Lien) that is senior to the Option, and/or Hometap is being asked to subordinate its Option, any such subordination agreement or consent shall be in a form reasonably acceptable to Hometap.

(3) In connection with a request for an Approved Subsequent Loan, Hometap, in its sole discretion, will either use the Beginning Home Value for the purpose of calculating the Current Property Value and Minimum Owner Equity or may require, at Owner's expense, a new Appraisal of the Property.

(4) Following receipt of (i) a request for an Approved Subsequent Loan, (ii) all documentation required in Section 6.1(i)(ii)(1), and (iii) a new Appraisal (if applicable), Hometap will conduct all such other inquiries and reviews as it deems necessary to make a determination regarding whether to consent to such Approved Subsequent Loan; *provided, however*, that so long as such request meets all such requirements, consent to such Approved Subsequent Loan shall not be unreasonably withheld.

(5) In the event that Hometap consents to an Approved Subsequent Loan, Owner shall provide Hometap with the final executed documentation relating to such Approved Subsequent Loan as soon as reasonably practicable following the closing of such transaction.

(iii) Prohibited Loans and Transactions. Owner will not encumber the Property with, and Hometap will not give consent to, any proposed transaction that could have the effect of impairing Hometap's rights under the Investment Documents, or the Hometap Share, including "reverse" mortgage loans, "shared appreciation" mortgage loans, mortgage loans with negative amortization features, private or non-institutional loans, investments in the equity or appreciation of the Property, or unrecorded loans secured by the Property.

(iv) Subsequent Loans used for Owner Repurchase. Owner may incur additional indebtedness secured by a lien on the Property at any time during the Effective Period if Owner is incurring such additional indebtedness in order to execute an Owner Repurchase in full compliance with the terms of this Agreement, including but not limited to Section 2.4. In all such instances, Hometap shall receive a direct payment, via wire transfer or similar means, for the entire Hometap

Share concurrently with the closing of this subsequent indebtedness; failure to do so will be considered an Event of Default. Notwithstanding the foregoing, Hometap reserves the right to withhold its approval for the additional indebtedness if Hometap believes, in its sole discretion, that such additional indebtedness will not facilitate a full Owner Repurchase.

(j) Obligation to Provide Information to and Cooperate with Hometap. During the Effective Period, you will cooperate with Hometap to schedule any Appraisal, and you will use commercially reasonable efforts to promptly respond to requests for information that Hometap may reasonably ask from time to time regarding the status of the Property, or information, reports, proof of payment of taxes or assessments, insurance policies, proof of insurance coverage, and any other information available to you concerning the Property and any modifications to the Property. You will immediately provide us with notice of any event that has or may be expected to have a material effect upon the Property, the value of the Property, the Option, or Hometap's rights under the Investment Documents, including, without limitation, (i) the death or divorce of any Owner; (ii) the death or removal of any Trustee or Trustor, as well as the appointment of any substitute or additional Trustee or Trustor; (iii) environmental matters affecting the Property; (iv) the commencement of any legal action involving the Property; or (v) the occurrence of an Event of Default.

(k) Waiver of Right to Partition. Owner agrees to waive and relinquish all rights you may now or later have to seek partition of the Property, whether in kind or by sale.

Section 6.2 Hometap Rights and Covenants.

(a) Hometap Interest. Pursuant to this Agreement, during the Effective Period, Hometap shall have an economic interest in the Property, which is protected by this Agreement and the other Investment Documents.

(b) Waiver of Right to Partition. Hometap waives and relinquishes all rights it may now or later have to seek partition of the Property, whether in kind or by sale; *provided, however*, that we will retain the right to seek a partition (i) in the event of, and as part of any action arising out of an Event of Default, which is not timely cured pursuant to Section 7.2, or (ii) in connection with any claim or action by Owner which asserts that any provision of this Agreement is against the law or unenforceable.

(c) Right to Disclose Certain Information. We may share certain personal and financial information relating to you or the Property with our affiliates, subsidiaries, assignees, contractors, agents, representatives, and persons with whom we intend to conduct business, including the address and general location of the Property, appraisal reports and other valuations of the Property, and the financial terms of this Agreement, to the extent not prohibited by law.

(d) Agreement to Subordination. We may agree to subordinate the priority of our rights under any of the Investment Documents to the lien of any lender that refinances any Acknowledged Pre-Existing Lien or proposes to extend to you any other Approved Subsequent Loan secured by a lien on the Property; *provided that* any requested subordination and loan documents contain only reasonable and customary terms common to such agreements, and you pay any amounts we reasonably require.

(e) No Hometap Liability. Hometap shall not be liable for any (i) Acknowledged Pre-Existing Liens, Liens and Encumbrances, Approved Subsequent Loans, or any other loans or obligations to any third parties created, established, or obtained by you whether before or after the consummation of the transactions contemplated hereunder, and whether or not consented to, approved by, or subordinated to by us, or (ii) for homeowner association fees, property taxes, homeowner or property insurance, or other liabilities or obligations that might arise in connection with the Property.

## SECTION 7
## EVENTS OF DEFAULT

Section 7.1 Events of Default. The occurrence of any of the following will constitute an Event of Default ("**Event of Default**"):

(a) you breach or fail to perform any obligation or covenant under the Investment Documents, including any action or failure to act resulting in, or which can reasonably be expected to result in, a violation of Hometap's rights herein or a breach of this Agreement or other Investment Document, which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(b) you take any action that does not honor the Option or you omit to state a material fact relating to your obligations in this Agreement, including any misrepresentation or omission related to the amount or kind of consideration given to you in any Transfer which can reasonably be expected to result in a violation of Hometap's rights under the Investment Documents or a breach of this Agreement or other Investment Document), which breach or failure is not cured (if capable of being cured) within thirty (30) days of the occurrence thereof;

(c) you fail to timely provide us any notice required under this Agreement;

(d) any representation or warranty set forth above in Section 4.1, is or becomes false or misleading, and you fail to correct and provide Hometap written notice of such false or misleading representation or warranty within five (5) Business Days of becoming aware of such occurrence;

(e) (i) the voluntary or involuntary commencement of any case or proceeding against an Owner under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency, or similar law, or the appointment or election of a receiver, conservator, trustee, custodian, or similar official for an Owner or any substantial part of the Property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the making by an Owner of a general assignment for the benefit of creditors, or (iii) the admission in writing by an Owner of Owner's inability to pay such Owner's debts as they become due or of your or any co-owner's insolvency, and in all cases, where such case, proceeding, assignment, or admission is not dismissed or otherwise reversed within thirty (30) days;

(f) Owner fails to pay in a timely manner any taxes, assessments, liens, amounts due under loans that are secured by liens on the Property, whether recorded or unrecorded, or other obligations relating to or on the Property, which failure is not cured within thirty (30) days of the occurrence thereof;

(g) the Transfer or attempted Transfer of the Property, or any interest in the Property, by you, except in accordance with this Agreement;

(h) a lien attaches to the Property that does not have our prior written approval, or you obtain any loan secured or to be secured by the Property that we have not approved in writing, whether recorded or unrecorded;

(i) you fail to preserve or maintain the Property in good repair and in a condition substantially similar to its condition on the Effective Date, except for normal wear and tear;

(j) insurance on the Property is not maintained as required by this Agreement, including any payment due on the insurance becomes delinquent, which failure, if curable, is not cured within thirty (30) days of the occurrence thereof;

(k) any assignment, attempted assignment, or other transfer of the Option or Investment Documents in violation of this Agreement;

(l) any other action or event occurs within your reasonable control which has, or may reasonably be expected to have, a material adverse effect on the Property, the value of the Property, the Option, or the Hometap Share.

Section 7.2 Remedies Following Event of Default. Following an Event of Default, Hometap will provide you with a Notice of Right to Cure Default, which shall state the specific Event(s) of Default and the time in which it must be cured, which shall be no more than thirty (30) days following delivery of the Notice of Right to Cure Default. If Owner fails to cure the default within the time period set forth in the Notice of Right to Cure Default, Hometap may declare a default by delivering to you a written notice (a "**Default Notice**") and may exercise any of the rights and remedies set forth below in this Section 7.2.

(a) Hometap Option Exercise. Upon delivery of a Default Notice, we will have the right in our sole discretion to initiate and complete a Hometap Option Exercise in compliance with Section 3.1. We may record the Default Notice in the county where the Property is located.

(b) Hometap Cure. To the extent that you fail to take any actions or make any payments that Hometap determines are necessary to avoid or remedy an actual or impending Event of Default or otherwise protect Hometap's rights under the Investment Documents or the Option, Hometap shall have the right, but not the obligation, to take such actions or complete such payments ("**Hometap Cure Payments**"). We may make payments to cover any delinquent payments, insurance premiums, accrued interest, late fees, reinstatement fees, property and other taxes, and other penalties, together with any and all amounts which we deem necessary to cure an Event of Default. Hometap shall provide Owner with five (5) Business Days written notice, or the minimum notice period required by applicable law, prior to taking any corrective action or making any Hometap Cure Payments, which may include, without limitation, payment of taxes, placement of insurance or curing of a default with a lender or other third party with an interest in the Property. Beginning on the day a Hometap Cure Payment is made, interest shall accrue at the lesser of eight percent (8%) per annum or the maximum amount permitted by applicable law. Hometap shall have the right to demand repayment of any Hometap Cure Payments (plus applicable interest) on five (5) Business Days' notice, and failure to pay such amounts shall be deemed an Event of Default. Notwithstanding anything in the foregoing to the contrary, any repayment of Hometap Cure Payments will be deemed reimbursement of expenses and the Hometap Cap shall not apply to such amounts.

(c) Power of Foreclosure Under State Laws. We will be entitled to foreclose on the Property and otherwise exercise our rights under the Mortgage and Security Agreement in accordance with applicable laws and regulations established in the jurisdiction where the Property is located.

(d) Failure to Maintain Adequate Insurance. If you fail to maintain insurance in amounts required by Section 6.1(c), or any insurance claim is denied due to Owner's action or inaction, then the Hometap Share will be increased by the amount of any such denied claim. Any such increase shall be deemed exempt, on a dollar-for-dollar basis, from the Hometap Cap. If this occurs, we may complete a Hometap Option Exercise if we have not already done so and Transfer the Property in its then-current state according to the procedure set forth in Section 3.1. The proceeds of any Transfer pursuant to this Section 7.2(d), together with any available proceeds from any insurance policies (whether or not the underlying insurance was required by us), will be allocated as in the order provided in Section 6.1(d)(ii).

(e) Owner Repurchase After Event of Default. At any time following our delivery of a Default Notice, you may repurchase the Option by paying us the Hometap Share in an Owner Repurchase pursuant to Section 2.4 above; *provided that* the Repurchase Settlement must (i) occur (A) within twenty (20) days

of you providing us written notice of your election to make an Owner Repurchase, and (B) prior to any scheduled closing of a Hometap Option Exercise, and (ii) use an Ending Home Value that is the value of the Property as determined by a Physical Appraisal. If you elect to make an Owner Repurchase, but the Repurchase Settlement is not completed within the prescribed periods in this Section 7.2(e) then (1) your right to make an Owner Repurchase may be terminated, and (2) we may elect to immediately exercise a Hometap Option Exercise without regard to any restrictions in Section 3.1.

(f) Specific Performance, Rescission and Injunctive Relief. You and we agree that if we are not allowed to exercise our rights under any of the Investment Documents, or if you fail to comply with your obligations under any of the Investment Documents, the damages to us would be irreparable and extremely difficult to estimate, making money damages, or any remedy at law inadequate. Thus, in addition to any other rights and remedies available to us in law, equity, or otherwise, we will be entitled to seek specific performance of the covenants, agreements, and rights contained in each of the Investment Documents or, as permitted by applicable law, to seek full rescission of this Agreement. You and we further agree and acknowledge that a violation or threatened violation of this Agreement by you is likely to cause irreparable injury to us and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, we are entitled to obtain immediate and other injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by you, without the posting of a bond or the necessity of proving actual damages.

Section 7.3 Repayment in Bankruptcy. If we are required to and do remit or disgorge any amounts paid by you pursuant to this Agreement as a preference claim in a bankruptcy proceeding involving you, then we will be entitled to assert a claim against you for the amount remitted or disgorged and any related costs we incur, and such claim by us will begin to accrue on the date such amount is actually remitted or disgorged and will automatically survive the Effective Period.

Section 7.4 Calculation of Liquidated Damages. To the extent that enforcement of the Security Instrument requires specification of an amount in default or liquidated bid amount or we elect to foreclose on the Property, Owner and Hometap agree and acknowledge that the damages that would arise from Owner's (or Owner's executor's) defaults may be uncertain, depend on many factors, and may be extremely difficult to ascertain, and that a reasonable calculation of such damages is the calculation of liquidated damages. The amount in default or liquidated bid amount under any remedy may also include: (a) the sum of all monetary obligations owed to us by you under this Agreement; and (b) any amounts required to satisfy your loan, tax, and insurance related obligations on the Property, including late fees, reinstatement fees, and other penalties.

Section 7.5 Remedies Concurrent and Not Exclusive. The remedies set forth in Section 7.2 will be concurrent, cumulative, and not exclusive, to the extent not prohibited by law. Every right, power, and remedy granted to us in the Investment Documents will be in addition to all those rights, powers, and remedies available to us at law, equity, or otherwise, and each such right, power, and remedy may be exercised from time to time and as often and in any order we decide to the extent not prohibited by law, and the decision not to exercise of any such right, power, or remedy will not be deemed a waiver of the right to exercise any right, power, or remedy.

## SECTION 8
## MISCELLANEOUS

Section 8.1 Indemnification by Owner and Maximum Liability. You agree to defend, indemnify, and hold us harmless from and against any claims, causes of action, proceedings, judgments, damages, losses, liabilities, penalties, fines, reasonable fees (including reasonable attorneys' fees), reasonable costs, reasonable expenses, settlements, and other obligations of every kind arising out of or relating to: (a) a

breach of any of your representations, warranties, covenants, or agreement in this Agreement or the other Investment Documents; (b) any act or omission by you or your contractors, agents, or representatives; or (c) any and all damage to any person or property occurring in, on, or about the Property or off the Property arising out of actions on the Property. Notwithstanding your indemnification obligation under this Section 8.1, at our election, we may defend any third-party claim subject to your indemnification obligation with counsel of our own choosing at your reasonable cost and expense and without your participation. You will not, without our prior written consent, which shall not be unreasonably withheld settle or compromise any claim, action or proceeding or consent to the entry of any judgment regarding which indemnification is owed to us. WITHOUT LIMITING YOUR INDEMNIFICATION OBLIGATION, IN NO EVENT WILL OUR AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE PROPERTY EXCEED THE INVESTMENT AMOUNT.

Section 8.2 Asset Administration. From time to time during the Effective Period, Hometap may designate one or more authorized representatives to (a) monitor and effect your compliance with this Agreement and any other Investment Documents, (b) exercise our rights and carry out our obligations under this Agreement or any other Investment Documents, (c) protect and administer the Option, and (d) do anything else we may be permitted to do under this Agreement or any other Investment Documents.

Section 8.3 Covenants to Run with Land. The provisions of this Agreement are covenants running with the land so long as this Agreement remains in effect. We will record the Security Instrument reflecting this fact in the public records.

Section 8.4 Relationship. We are not a partner, joint venturer, trustee, lender, or fiduciary with, or of, Owner. You are not permitted to execute any document or enter into any agreement on our behalf. The Option is intended to be and will be treated for all purposes (including tax purposes) as an economic interest and not as a loan or joint venture.

Section 8.5 Ongoing Credit Checks. By entering into this Agreement, you are providing written instructions, consent, and authorization to Hometap under the Fair Credit Reporting Act authorizing Hometap to obtain information from your personal credit report or other information for the duration of the Effective Period from one or more consumer reporting agencies, such as TransUnion, Experian, or Equifax.

Section 8.6 Multiple Owners. If multiple Persons are Owners, then: (a) the Investment Documents must be signed by each Owner; (b) all rights and powers specified for Owner in the Investment Documents must be approved and exercised unanimously by each Owner; (c) each Owner will be jointly and severally liable for all liabilities and obligations specified for an Owner under this Agreement or any other Investment Documents; (d) any notice required to be given by or to an Owner will be deemed adequately given if given by or to any Owner using the Notice Address, as defined below in Section 8.16; and (e) we may treat any notice received from any one Owner as notice from all Owners.

Section 8.7 Revocable Trusts. If Owner is a Revocable Trust: (a) all Trustors must sign the Investment Documents in their capacities as individuals and as Trustors; (b) all Trustees must sign the Investment Documents in their capacities as Trustees; (c) each Trustee and Trustor who signs this Agreement represents and warrants that all Trustees and Trustors have been disclosed to us; (d) all rights and powers specified for, and all actions required of, Owner in the Investment Documents must be approved and exercised by all Trustees unanimously; (e) all Trustors, in their capacities as individuals, will be jointly and severally liable with Owner for all liabilities and obligations specified for Owner under any of the Investment Documents; (f) all representations and warranties by Owner in the Investment Documents are made by all Trustees on behalf of the Revocable Trust and by all Trustors in their capacities as individuals; (g) notice required to be given by or to an Owner will be deemed adequately given if given by or to any of the Trustees using the

Notice Address, as defined below in Section 8.16; and (h) we may treat any notice received from any one Trustee as notice from all Trustees and from Owner.

Section 8.8 Delegation of Duties. We may perform any of our duties under this Agreement or any other Investment Document by or through contractors, agents, employees, or attorneys-in-fact and will be entitled to advice of counsel concerning all matters pertaining to such duties and any actions taken on the basis of such advice from counsel will be deemed to have been taken in good faith. We will not be responsible for the negligence or misconduct of any contractor, agent, employee, or attorney-in-fact that we select as long as our selection was made without gross negligence or willful misconduct.

Section 8.9 Successors and Assignees; Owner's Estate. The Investment Documents will be binding on your and our respective heirs, successors, and permitted assignees. If Owner dies, then the Investment Documents will be binding on Owner's Estate. The death of Owner will not terminate any of the Investment Documents.

(a) Assignment by Hometap. We may assign, participate, hypothecate, sell, transfer, or otherwise transact, in whole or in part, our right and title to, and interest in, any of the Investment Documents at any time and to any Person without prior notice to or consent of Owner. In connection with any assignment, participation, hypothecation, sale, transfer, or transaction, we may disclose any documents and information in our possession relating to Owner and the Property. Upon such assignment, sale, or transfer, our assignee, buyer, or transferee will automatically have all the rights and remedies of Hometap under the Investment Documents. You will execute and deliver in recordable form, if requested, at our expense, such other documents we deem appropriate to reflect the assignment, sale, or transfer of the Option and the other Investment Documents. You agree to cooperate with such assignee, buyer, or transferee, including by executing any documents deemed appropriate by assignee, buyer, or transferee to insure or protect such Person's interest in the Investment Documents.

(b) Assignment of Agreement by Owner. Absent our prior written consent, which consent may be withheld, Owner may not assign or otherwise transfer any of the Investment Documents. We may grant consent to an assignment to Owner's spouse who acquires an interest in the Property or a Trustee of a Revocable Trust in which Owner is the sole Trustor; *provided that* in each case the assignee: (i) was alive as of the Effective Date; (ii) executes this Agreement; (iii) executes a recordable addendum to the Security Instrument in a form provided by us; (iv) executes an assignment with the assignor in a form satisfactory to us; and (v) provides any information or other documents requested by us and satisfactory to us (**"Exempted Owner Assignment"**). In the event of an Exempted Owner Assignment to the Trustee(s) of a Revocable Trust, the original Owner (i.e., the Trustor(s)), jointly and severally, will continue to remain liable under the Investment Documents.

(c) Exempted Owner Property Transfer. If Owner obtains our prior written consent, Owner may Transfer the Property into the name of Owner's spouse or the Trustees of a Revocable Trust in which you are the sole Trustor; *provided that* the requirements for an Exempted Owner Assignment under Section 8.9(b) are met (an **"Exempted Owner Property Transfer"**). An Exempted Owner Property Transfer shall not trigger a Hometap Option Exercise.

Section 8.10 Survival. The following provisions will survive any termination of this Agreement without limitation: (a) Owner's obligations to reimburse any Hometap Cure Payments and Option Fees; (b) Owner's obligation to remove any liens on the Property and pay any Sales Commissions and Transfer Closing Costs; (c) Section 7.2; (d) any amounts owed to us under this Agreement; (e) any other provisions which entitle us to remedies, fees, costs, and expenses; (f) Section 4; and (g) Section 8.

Section 8.11 Injunction. If we are stayed or enjoined from undertaking a Hometap Option Exercise, commencing or initiating any notice and procedures relating thereto in this Agreement, or enforcing any of our rights under this Agreement, the Option will not expire until ninety (90) days after such stay or injunction is lifted by a final order of the appropriate court. Any deadline or notice period contained in the Investment Documents which we are prevented or prohibited from observing by operation of law, court order, or otherwise, will automatically be stayed for the duration of such stay, injunction, prevention, or prohibition until such stay, injunction, prevention, or prohibition is no longer applicable or is lifted by final order of the appropriate court.

Section 8.12 Governing Law. The Option, this Agreement, and the other Investment Documents will be determined under, governed by, and construed in accordance with laws of the state in which the Property is located, without regard to its conflict of law principles to the furthest extent possible; *provided, however*, to the extent the mandatory provisions of the laws of another jurisdiction relating to (a) the perfection or the effect of perfection or non-perfection of any lien or other right, title, and/or interest in the Property, or (b) the availability of and procedures relating to any remedy hereunder or related to this Agreement are required to be governed by such other jurisdiction's laws, such other laws will be deemed to govern and control.

Section 8.13 DISPUTE RESOLUTION BY BINDING ARBITRATION. PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS.

(a) Agreement to Arbitrate. This Dispute Resolution by Binding Arbitration Section 8.13 is referred to in this Agreement as the "**Arbitration Agreement.**" You agree that any and all disputes or claims that have arisen or may arise between you and us, whether arising out of or relating to this Agreement or the other Investment Documents, any advertising, or any aspect of the relationship or transactions between us, will be resolved exclusively through final and binding arbitration, rather than a court, in accordance with the terms of this Arbitration Agreement, except that you may assert individual claims in small claims court, if your claims qualify. Further, this Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, and such agencies can, if the law allows, seek relief against us on your behalf. You agree that, by entering into this Agreement, you and we are each waiving the right to a trial by jury or to participate in a class action. Your rights will be determined by a neutral arbitrator, not a judge or jury. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement.

(b) WAIVER OF JURY TRIAL. TO THE FULLEST EXTENT POSSIBLE, HOMETAP AND OWNER VOLUNTARILY, UNCONDITIONALLY, AND IRREVOCABLY WAIVE TRIAL BY JURY UNDER ALL CIRCUMSTANCES WHETHER IN ANY LITIGATION OR PROCEEDING IN A STATE OR FEDERAL COURT RELATED TO, OR ARISING OUT OF, THE INVESTMENT DOCUMENTS OR THE OBLIGATIONS OR TRANSACTIONS CONTEMPLATED BY THE INVESTMENT DOCUMENTS, INCLUDING ALL CLAIMS OR DISPUTES HOWEVER ARISING (INCLUDING TORT CLAIMS AND CLAIMS FOR BREACH OF CONTRACT) BETWEEN HOMETAP AND OWNER.

(c) PROHIBITION OF CLASS AND REPRESENTATIVE ACTIONS AND NON-INDIVIDUALIZED RELIEF. YOU AND WE AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH YOU AND WE AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING

MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

(d) Pre-Arbitration Dispute Resolution. We are always interested in resolving disputes amicably and efficiently, and most concerns can be resolved quickly and to your satisfaction by emailing us at legal@hometap.com. If such efforts prove unsuccessful, a party who intends to seek arbitration must first send to the other, by certified mail, a written notice of dispute (a "**Notice of Dispute**"). The party seeking arbitration must send the Notice of Dispute to the other Party at their Notice Address (as defined in Section 8.16 below) by certified mail, with a copy of any Notice of Dispute directed to Hometap to legal@hometap.com. The Notice of Dispute must (i) describe the nature and basis of the claim or dispute, and (ii) set forth the specific relief sought. If we or you do not resolve the claim within sixty (60) days after the Notice of Dispute is received, we or you may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by us or you will not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled.

(e) Arbitration Procedures. Arbitration will be conducted by a neutral arbitrator in accordance with the American Arbitration Association's (the "**AAA**") rules and procedures, including the AAA's Consumer Arbitration Rules (collectively, the "**AAA Rules**"), as modified by this Arbitration Agreement. For information on the AAA, please visit its website, http://www.adr.org. Information about the AAA Rules and fees for consumer disputes can be found at the AAA's consumer arbitration page, http://www.adr.org/consumer. If there is any inconsistency between any term of the AAA Rules and any term of this Arbitration Agreement, the terms of this Arbitration Agreement will control unless the arbitrator determines that the application of the inconsistent Arbitration Agreement terms would not result in a fundamentally fair arbitration. The arbitrator must also follow the provisions of this Agreement as a court would. All issues are for the arbitrator to decide, including issues relating to the scope, enforceability, and arbitrability of this Arbitration Agreement. Although arbitration proceedings are usually simpler and more streamlined than trials and other judicial proceedings, the arbitrator can award the same damages and relief on an individual basis that a court can award to an individual under this Agreement and applicable law. Decisions by the arbitrator are enforceable in court and may be overturned by a court only for very limited reasons.

(f) Unless we and you agree otherwise, any arbitration hearings will take place in a reasonably convenient location for both parties with due consideration of their ability to travel and other pertinent circumstances. If the parties are unable to agree on a location, the determination will be made by AAA. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator will issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based.

(g) Costs of Arbitration. Payment of all filing, administration, and arbitrator fees (collectively, the "**Arbitration Fees**") will be governed by the AAA Rules, unless otherwise provided in this Arbitration Agreement. If the value of the relief sought is $75,000 or less, at your request, we will pay all Arbitration Fees. If the value of relief sought is more than $75,000 and you are able to demonstrate to the arbitrator that you are economically unable to pay your portion of the Arbitration Fees or if the arbitrator otherwise determines for any reason that you should not be required to pay your portion of the Arbitration Fees, we

will pay your portion of such fees. In addition, if you demonstrate to the arbitrator that the costs of arbitration will be prohibitive as compared to the costs of litigation, we will pay as much of the Arbitration Fees as the arbitrator deems necessary to prevent the arbitration from being cost-prohibitive. Any payment of attorneys' fees will be governed by the AAA Rules.

(h) Confidentiality. All aspects of the arbitration proceeding, and any ruling, decision, or award by the arbitrator will be strictly confidential for the benefit of all parties.

(i) Severability. If a court or the arbitrator decides that any term or provision of this Arbitration Agreement (other than Section 8.13(b)) is invalid or unenforceable, the parties agree to replace such term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Arbitration Agreement will be enforceable as so modified. If a court or the arbitrator decides that any of the provisions of Section 8.13(b) are invalid or unenforceable, then the entirety of this Arbitration Agreement will be null and void, unless such provisions are deemed to be invalid or unenforceable solely with respect to claims for public injunctive relief. The remainder of this Agreement will continue to apply.

(j) Future Changes to Arbitration Agreement. Notwithstanding any provision in this Agreement to the contrary, we agree that if we make any future change to this Arbitration Agreement (other than a change to the Notice Address) during the Effective Period, you may reject any such change by sending us written notice within thirty (30) days of the change to the Notice Address. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this Arbitration Agreement as of the date you first accepted this Agreement (or accepted any subsequent changes to this Agreement).

Section 8.14 Further Assurances. Each party agrees, from time to time, as requested by the other party or its successors, assigns, buyers, or transferees, to execute and deliver any instruments and take any action reasonably necessary or desirable in order to implement the provisions and otherwise to effect the intent and purposes of the Investment Documents.

Section 8.15 Severability; Waivers. Each provision of this Agreement and of the other Investment Documents will be severable from every other provision for the purpose of determining the legal enforceability of any provision and will be construed separately and is separately enforceable from every other provision. No waiver by us of any of our rights or remedies in connection with this Agreement or the other Investment Documents will be effective unless the waiver is in writing and signed by both parties, and then any waiver or consent will be effective only in the specific instance and for the specific purpose for which given. No delay, consent, or waiver by us will be construed as continuing, as a bar to, or as a waiver or release of, any subsequent right, remedy, or recourse. To the extent that enforcement of any provision or exercise of any right under this Agreement or the other Investment Documents is held to be invalid or stayed or enjoined by a court of competent jurisdiction, then the provision will be considered separate and apart from the remaining provisions, and any other remaining provisions will continue to be fully enforceable under law.

Section 8.16 Notice. Each party will deliver all notices, requests, consents, claims, demands, waivers, and other communications under this Agreement (each, a "**Notice**") in writing to the address of the other party listed below, unless a party has been notified by the other party in writing of a substitute address ("**Notice Address**"). Each party will deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). A Notice is effective only upon receipt by the receiving party. If any Notice required by the Security Instrument is also required under applicable law, such requirement of law will satisfy the corresponding requirement under this Agreement.

**HOMETAP:**

Hometap Investment Partners III SPV, LLC
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department
Email: homeowners@hometap.com

**OWNER:**

See signature page.

Section 8.17 Entire Agreement; Amendment. Schedule A and the exhibits are incorporated into this Agreement by this reference. This Agreement, the Security Instrument, and the other written agreements made by and between the parties as of the Effective Date together constitute the entire agreement between the parties regarding the subject matter contained in them. All prior agreements, understandings, representations, warranties, statements, and negotiations between the parties, if any, whether oral, electronic or written, relating to the Property, the Option, this Agreement, the other Investment Documents, and the related transaction, including any offer letters, terms sheets, and draft and earlier versions of settlement statements and other documents and agreements, are superseded and merged into this Agreement. No supplement, modification, or amendment of this Agreement will be binding unless in writing and executed by the party against whom enforcement is sought.

Section 8.18 No Third-Party Beneficiaries. This Agreement and the other Investment Documents are entered into for the protection and benefit of us and Owner and their respective successors and permitted assigns. No other Person will have any rights, remedies, or recourse under this Agreement or the other Investment Documents.

Section 8.19 Counterparts; Electronic Signatures. This Agreement and the other Investment Documents may be executed in counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement. A signed copy of this Agreement that is transmitted by a party to the other party via facsimile or by electronic means will be binding on the signatory to that copy.

Section 8.20 Registered Domestic Partnerships and Civil Unions. An Owner will have the same rights and obligations with respect to Owner's civil union partner or registered domestic partner as Owner will have with respect to its spouse for all purposes under the Investment Documents, subject to the same conditions and limitations that would apply to a transfer or assignment to Owner's spouse, a payment by Owner's spouse, or the rights of Owner's spouse not on record title.

Section 8.21 Consent of Spouse/Domestic Partner. Consent of Spouse/Domestic Partner. If you should marry or remarry or enter into a civil union or registered domestic partnership during the Effective Period, within thirty (30) days after the marriage, civil union, or domestic partnership, as applicable, you and your spouse or domestic partner, as applicable, must notify Hometap and execute any reasonably necessary documents to acknowledge your spouse or domestic partner's interest in the Property, this Agreement, and the Security Instrument, which may include a Consent of Spouse/Domestic Partner and/or joinder to this Agreement.

Section 8.22 RECOMMENDATION TO SEEK LEGAL AND TAX ADVICE. OWNER UNDERSTANDS THAT THE SALE OF THE PROPERTY, OR THE SALE OF AN ECONOMIC INTEREST IN THE PROPERTY, CAN HAVE SIGNIFICANT TAX, FINANCIAL, AND FAMILY CONSEQUENCES. OWNER ACKNOWLEDGES THAT HOMETAP HAS REQUESTED THAT OWNER DISCUSS THIS AGREEMENT WITH TAX, LEGAL, AND FINANCIAL ADVISORS AND WITH FAMILY MEMBERS TO ENSURE AN UNDERSTANDING OF THE RISKS AND BENEFITS OF THIS AGREEMENT, AND OWNER HAS HAD THE OPPORTUNITY TO DO SO.

Section 8.23 NO ADVICE. IN ENTERING INTO THE INVESTMENT DOCUMENTS AND INTO ANY FUTURE PROPERTY SALE, OWNER IS NOT RELYING AND WILL NOT RELY ON ANY INFORMATION OR REPRESENTATION THAT MAY HAVE BEEN PROVIDED BY HOMETAP OR ITS AGENTS OR REPRESENTATIVES, INCLUDING: (a) THE VALUE OF THE PROPERTY OR THAT THE BEGINNING HOME VALUE IS A REPRESENTATION OF THE MARKETABLE, INSURABLE, OR FAIR MARKET VALUE OF THE PROPERTY; (b) THE ADVISABILITY OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE; OR (c) THE TAX IMPLICATIONS AND CONSEQUENCES OF ENTERING INTO THE INVESTMENT DOCUMENTS OR A PROPERTY SALE. OWNER HAS MADE, AND WILL MAKE, HIS, HER OR ITS OWN INVESTIGATION AND JUDGMENTS REGARDING SUCH MATTERS AND HAS BEEN ADVISED BY HOMETAP TO DISCUSS THEM WITH OWNER'S LEGAL, FINANCIAL AND TAX ADVISORS, AS WELL AS WITH FAMILY MEMBERS.

Section 8.24 Subordination of Homestead and Waivers. If you have acquired or acquire in the future an estate of homestead in the Property, you agree, to the greatest extent permitted by applicable law, that such homestead estate is subordinated in all respects to the Mortgage and Security Agreement and any amounts due under this Agreement and to all renewals, extensions, and modifications of the Mortgage and Security Agreement or this Agreement, and that such homestead estate is subject to all of our rights under the Mortgage and Security Agreement and this Agreement and all renewals, extensions and modifications of the Mortgage and Security Agreement and this Agreement, and is subordinate to the lien evidenced by the Mortgage and Security Agreement, and all renewals, extensions and modifications of the Mortgage and Security Agreement. You waive and relinquish all rights of curtesy and dower in the Property.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]**

C-FL 855513

REOF, intending to be legally bound, the parties hereto have caused this ıs of the Signing Date. This Agreement may be executed in multiple 'hen so executed will be deemed an original, but all such counterparts will reement.

**HOMETAP INVESTMENT PARTNERS III SPV, LLC**

By: Hometap Equity Partners, LLC,
Its Manager

By: ______________________

Name: Adam Jaskievic

Title: VP, Compliance & Operations

Date: 8/25/22

Acknowledgment Certificate

Commonwealth of Massachusetts

County of Middlesex

On this 25th day of August, 2022, before me, the undersigned notary public, personally appeared Adam Jaskievic, VP, Compliance & Operations, proved to me through satisfactory evidence of identification, which was MA Driver's License, to be the person whose name is signed on the preceding or attached document in my presence, and acknowledged to me that they signed it voluntarily for its stated purpose, as an authorized signatory for Hometap Investment Partners III SPV, LLC, a limited liability company.

______________________
Notary Public Signature

KYLE BUTLER
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 9, 2028

My commission expires ______________________

**IN WITNESS WHEREOF**, intending to be legally bound, the parties hereto have caused this Agreement to be executed as of the Signing Date. This Agreement may be executed in multiple counterparts, each of which when so executed will be deemed an original, but all such counterparts will constitute one and the same agreement.

**OWNER(S)**

By: ______________________________
Leslie Andreula

Date: 8-25-2022

By: ______________________________
Dominick Andreula

Date: 8-25-2022

Notice Address:
5344 Moon Shadow Ln, Greenacres, FL 33463

**Acknowledgment Certificate**

State of Florida
County of Palm Beach

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online, notarization, this 25 day of August, 2022, by Leslie Andreula.

JEANNETTE GRENIER
Notary Public - State of Florida
Commission # GG 925339
My Comm. Expires Dec 1, 2023
Bonded through National Notary Assn.

(Notary Seal)

Signature of Notary Public - State of Florida

Jeannette Grenier
Printed Name of Notary

Personally Known ______ OR Produced Identification ✓

Type of Identification Produced Driver License

**Acknowledgment Certificate**

State of Florida
County of Palm Beach

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this 25 day of August, 2022 by Dominick Andreula.

JEANNETTE GRENIER
Notary Public - State of Florida
Commission # GG 925339
My Comm. Expires Dec 1, 2023
Bonded through National Notary Assn.

(Notary Seal)

Signature of Notary Public - State of Florida

Jeannette Grenier
Printed Name of Notary

Personally Known ______ OR Produced Identification X

Type of Identification Produced Driver License

CFN 20220369402
OR BK 33820 PG 60
RECORDED 9/6/2022 12:51 PM
AMT$65,000.00
MTG DOC $227.50
INTANGIBLE $130.00
Palm Beach County, Florida
Joseph Abruzzo, Clerk
Pgs: 60 - 73; (14pgs)

EXHIBIT
B

***After Recording Return To:***
Hometap Equity Partners, LLC
800 Boylston Street
16th Floor
Boston, MA 02199

***Recording Requested By:***
*Hometap Investment Partners III SPV, LLC*
Investment No.: FL294959

***Recording Prepared By:***
Adam Jaskievic
Hometap Equity Partners, LLC
800 Boylston Street, 16th Floor
Boston, MA 02199

C-FL855513

_________________**[Space Above This Line For Recording Data]** _________________

**Investment Amount: $65,000.00**

## MORTGAGE AND SECURITY AGREEMENT

This MORTGAGE AND SECURITY AGREEMENT, together with any riders (this "**Security Instrument**"), is made as of 08/25/2022 ("**Signing Date**"), by and between Dominick Andreula and Leslie Andreula, husband and wife (collectively, the "**Owner/Mortgagor**") and Hometap Investment Partners III SPV, LLC, a Delaware limited liability company, and its successors and assigns ("**Hometap/Mortgagee**"). This Mortgage and Security Agreement was prepared by Adam Jaskievic, with an address of: c/o Hometap, 800 Boylston Street, 16th Floor, Boston, MA 02199.

## RECITALS

A. This Security Instrument is given in connection with the execution of the Option Purchase Agreement by and between Owner and Hometap (the "**Option Agreement**") of even date, by which Mortgagor grants and conveys to Mortgagee the option to purchase an undivided percentage interest in that certain real property and improvements thereof located at 5344 Moon Shadow Ln, Greenacres, FL 33463 and further described on Exhibit A attached hereto (the "**Property**").

B. Mortgagee desires to secure the rights granted to it in the Option Agreement and the performance of the Obligations (as defined below).

C. This Security Instrument is given pursuant to the Option Agreement, and payment fulfillment, and performance of the obligations due under the Option Agreement are secured by this Security Instrument- in accordance with the terms set forth herein.

D. Capitalized terms used in this Security Instrument have the meanings provided in this Security Instrument, or if not defined in this Security Instrument, in the Option Agreement. The Option Agreement and this Security Instrument are collectively referred to as the "**Hometap Homeowner Agreement.**"

## TERMS

1. Grant. OWNER HEREBY IRREVOCABLY mortgages and conveys to Mortgagee, and its successors and assigns, a security interest for the benefit of Hometap, and its successors and assigns, in and to the Property, together with all improvements, replacements, and additions now or hereafter erected on the Property, all easements, appurtenances, and fixtures now or hereafter a part of the Property, and all rents, issues, profits, and proceeds, including insurance and condemnation proceeds, from the Property.

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly (a) pay to Mortgagee the Hometap Share at the time and in the manner provided in the Option Agreement, this Security Instrument, and the other Investment Documents, (b) perform the Obligations as set forth in the Option Agreement, this Security Instrument, and the other Investment Documents, and (c) abide by and comply with each and every covenant and condition set forth in the Option Agreement, this Security Instrument, and the other Investment Documents, these presents and the estate hereby granted shall cease, terminate, and be void; *provided, however*, that Mortgagor's obligation to indemnify and hold harmless Mortgagee pursuant to the provisions hereof shall survive any such payment and release.

2. Secured Obligations. Owner makes the mortgage and conveyance set forth in Section 1 to secure the following:

(a) Owner's performance of each of its obligations in the Option Agreement;

(b) Mortgagee's rights under the Option Agreement;

(c) Owner's payment obligations in the Option Agreement, including:

(i) Payment of the Hometap Share owed to Mortgagee pursuant to the terms of the Option Agreement;

(ii) Payment of all Option Fees owed to Mortgagee pursuant to Section 6.1 of the Option Agreement;

(iii) Payment of all insurance proceeds owed to Mortgagee pursuant to Section 6.1 of the Option Agreement;

(iv) Payment of all condemnation proceeds owed to Mortgagee pursuant to Section 6.1 of the Option Agreement;

(v) Payment of the liquidated damages pursuant to Section 7.4 of the Option Agreement;

(vi) Reimbursement of any expenditures made by Mortgagee pursuant to Section 6.1 and Section 7.2 of the Option Agreement; and

(d) Payment of all costs, fees, and expenses (including, as allowed by applicable law, court and other dispute resolution costs, attorneys' and experts' fees and costs, and fees and disbursements

of in-house counsel) (collectively, "**Legal Fees**") incurred by Mortgagee in the enforcement and collection of the obligations listed above and the protection of Mortgagee's related rights, whether such costs, fees, and expenses are incurred in any state, federal, appellate, or bankruptcy court or otherwise and whether or not litigation or arbitration is commenced. Legal Fees include Legal Fees incurred in any state, federal, appellate, or bankruptcy court and in any bankruptcy case or insolvency proceeding, of any kind in any way related to this Security Instrument, to the interpretation or enforcement of the parties' rights under this Security Instrument, or to the Property.

The foregoing obligations are referred to collectively as the "**Obligations.**"

3. Uniform Commercial Code Security Agreement and Fixture Filing. This Security Instrument also is intended to be and will constitute a fixture filing financing statement and security agreement under the Florida Commercial Code for any items of personal property that constitute fixtures or are specified as part of the Property and that under applicable law may be subject to a security interest under the Florida Commercial Code. Owner grants to Mortgagee a security interest in those items to secure the performance and payment of the Obligations.

(a) Owner agrees that Mortgagee may file this Security Instrument, or a copy of it, in the real estate records or other appropriate index and/or in the Office of the Secretary of State of Florida, as a financing statement for any of the items specified in the preceding paragraph as part of the Property.

(b) This Security Instrument constitutes a financing statement filed as a fixture filing pursuant to Sections 679.5011(1)(a) and 679.5021(3) of the Florida Commercial Code, and any similar or successor provisions.

(c) Mortgagee may file such extensions, renewals, amendments, and releases as are appropriate to reflect the status of its security interest.

(d) Owner will pay all costs, fees, and expenses of filing such financing statements and any extensions, renewals, amendments, and releases of such statements, and will pay all costs, fees, and expenses of any record searches for financing statements that Mortgagee may require.

(e) Upon an Event of Default, Mortgagee will have the remedies of a secured party under the Florida Commercial Code and may also take the actions provided in Section 7 of the Option Agreement. In exercising any of these remedies and taking any of these actions, Hometap may proceed against the Property's items of real property, fixtures or improvements separately or together and in any order whatsoever without in any way affecting the availability of Mortgagee's remedies under the Florida Commercial Code or the actions available in Section 7 of the Option Agreement.

4. Absolute Assignment of Leases and Rents. Owner absolutely and unconditionally assigns to Hometap all of Owner's right, title, and interest in and to all current and future leases, subleases, and licenses relating to the use, occupancy, or enjoyment of all or any part of the Property and all rents, income, revenues, profits, proceeds, and earnings now or hereafter payable with respect to the ownership, use, or occupancy of the Property (collectively, "**Rents**"); it being intended by Owner that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.

(a) Owner gives to and confers upon Mortgagee the right, power, and authority, during the continuance of this Security Instrument, to collect the Rents, reserving the right upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, to collect and retain the Rents, as they become due and payable.

(b) Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Mortgagee may at any time without notice, either in person, by agent, or by a receiver to be appointed by a court, and without regard to the adequacy of any security for the Obligations, enter upon and take possession of the Property or any part of it, in its own name sue for or otherwise collect the Rents, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including Legal Fees, to the Obligations, and in such order as Mortgagee may determine.

(c) The entering upon and taking possession of the Property, the collection of the Rents, issues, and profits and the application of the Rents, issues, and profits pursuant to this Security Instrument, will not cure or waive any breach or notice of default under this Security Instrument or invalidate any act done pursuant to such notice.

(d) Nothing in this Section will permit Owner to lease or rent the Property in contravention of any provision of the Option Agreement; nor will anything in this Section modify any provision in the Option Agreement relating to the use, lease, rent, or occupancy of the Property.

5. <u>Covenants of Owner Regarding the Property</u>. Owner agrees as follows:

(a) To appear in and defend any action, suit, or proceeding purporting to affect the security of this Security Instrument or the rights or powers of Mortgagee; and to pay all costs, fees, and expenses of Hometap (including cost of evidence of title and Legal Fees) incurred: (i) in any state, federal, appellate, or bankruptcy court, in any action, suit, or proceeding in which Mortgagee may appear, and in any action, suit, or proceeding brought by Mortgagee to foreclose this Security Instrument or to collect the Obligations or to protect Mortgagee's rights under this Security Instrument or the Option Agreement; and/or (ii) in connection with the enforcement of any provision of this Security Instrument or in connection with foreclosure upon the collateral granted under this Security Instrument, whether or not an action or suit is filed.

(b) To pay at least ten (10) days before delinquency all taxes and assessments affecting the Property and all encumbrances, charges, and liens, with interest, on the Property (or any part of the Property), which are prior or could obtain priority to the lien or to the rights granted under this Security Instrument, and all costs, fees, and expenses of this Security Instrument.

(i) If Owner fails to make any payment or to do any act as provided in this Security Instrument, Mortgagee may, but will not be obligated to, make the payment or do any such act, and any such payment and related expenses, including Legal Fees, will also be secured by this Security Instrument.

(ii) Such payments made or actions taken by Mortgagee will not require notice to, or demand on, Owner and will not release Owner from any obligation under this Security Instrument.

(iii) Mortgagee will have the following related rights and powers: (A) to enter upon the Property for the foregoing purposes, (B) to appear in and defend any action or proceeding purporting to affect the Property or the rights or powers of Mortgagee under this Security Instrument, (C) to pay, purchase, contest, or compromise any encumbrance, charge, or lien that in the judgment of Mortgagee appears to be prior or superior to this Security Instrument, and (D) to employ counsel and to pay such counsel necessary expenses and costs, including Legal Fees.

(c) To pay immediately upon demand all sums expended by Mortgagee related to this Security Instrument and to pay interest on any of such amounts demanded by Mortgagee at a rate not to exceed the maximum rate allowed by law at the time of such demand.

6. Power of Attorney. Owner irrevocably appoints Mortgagee as Owner's agent and attorney-in-fact (such agency being coupled with an interest). As agent and attorney-in-fact, Mortgagee may, in Mortgagee's name or in the name of Owner, prepare, execute, and file or record financing statements, continuation statements, applications for registration, and similar documents to create, perfect, or preserve any of Mortgagee's security interests and rights in or to any of the Property. Upon an Event of Default, Owner's failure to perform any Obligation timely, or a breach of any agreement of Owner in this Security Instrument, Mortgagee may take any other action that may be required or desired of Owner, including the ability to advertise and solicit the Property for sale, encumber the Property by obtaining loans secured by liens on the Property to raise funds deemed required or advisable to improve, repair, and prepare the Property for sale, and sell and convey the entire interest in, and title to, the Property; *provided, however*, that Mortgagee as agent and attorney-in-fact will be accountable only for such funds as are actually received by Mortgagee.

7. Default and Foreclosure. Upon an Event of Default, Mortgagee may declare all performance and Obligations secured by this Security Instrument immediately due by delivery to Owner of a written declaration of default. If any Event of Default has occurred and is continuing, Mortgagee may take any or all of the following actions, at the same or at different times:

(a) Possession. Mortgagee may enter upon and take possession of the Property; lease, rent and let the Property; and receive all the Rents, income, issues, and profits and apply the same to satisfy any Obligation. Mortgagee is granted full power and authority to do any act or thing which Owner or its successors or assignees who may then own the Property might or could do in connection with the ownership, use, and maintenance of the Property. This covenant becomes effective either with or without any action brought to foreclose upon the Property and without applying for a receiver of the Rents, if any. Should the Rents or any part thereof be assigned without the consent of Mortgagee, then this Security Instrument will, at the option of Mortgagee, become due and payable immediately, anything herein contained to the contrary notwithstanding.

(b) Appointment of Receiver. Mortgagee may have a receiver of the Rents (including an Asset Administrator), income, issues, and profits of the Property appointed without the necessity of proving either the depreciation or the inadequacy of the value of the security or the insolvency of Owner or any other person who may be legally or equitably liable for the Obligations, and Owner and each such person waive such proof and consent to the appointment of a receiver.

(c) Fair Rental Payments. If Owner or any subsequent owner is occupying the Property or any part the Property, it is agreed that the occupants will pay Mortgagee the amount of rent requested by Mortgagee in advance each monthly, and for the use of personal property covered by this Security Instrument.

(d) Excess Monies. Mortgagee may apply on account of the unsatisfied Obligations owed to Hometap after a foreclosure sale of the Property, whether or not a deficiency action has or will be instituted, any unexpended monies still retained by Hometap that were paid by Owner to Mortgagee or from the proceeds of such sale (i) for the payment of, or as security for, the payment of taxes, assessments, municipal or governmental rates, charges, impositions, liens, water or sewer rents, or insurance premiums, if any, or (ii) in order to secure the performance of some act by Owner.

(e) Remedies at Law or Equity. Mortgagee may take any of the remedies otherwise available to it as a matter of law, equity or otherwise.

(f) Judicial Foreclosure. Mortgagee may foreclose this Security Instrument by judicial proceeding. In connection with the foreclosure sale, Mortgagee may declare all performance and Obligations immediately due by delivery to Owner of a written declaration of default. Mortgagee will give notice of default to Owner prior to acceleration following an Event of Default. The notice will specify: (i) the default; (ii) the action required to cure the Event of Default; (iii) a date by which the Event of Default must be cured; and (iv) that failure to cure the Event of Default on or before the date specified in the notice may result in acceleration of the performance and Obligations secured by this Security Instrument, foreclosure by judicial proceeding, and sale of the Property. The notice will further inform Owner of any right to cure after acceleration and the right to assert in the foreclosure proceeding the nonexistence of an Event of Default or any other defense of Owner to acceleration and sale. If the Event of Default is not cured on or before the date specified in the notice, Mortgagee at its option may require immediate performance in full of all Obligations without further demand and may foreclose this Security Instrument by judicial proceeding. Mortgagee will be entitled to collect all costs, fees, and expenses incurred in pursuing the remedies provided in this Security Instrument, including legal fees and costs of title evidence.

(g) Notice. Notice provided to Owner under this Security Instrument will be to the address specified in this Security Instrument unless otherwise required by applicable law.

(h) Applicable Law. Exercise of Mortgagee's remedies under this Security Instrument will be in compliance with applicable law.

8. Late Performance. By accepting performance of any Obligation after its due date, Mortgagee does not waive its right either to require prompt performance when due of all other Obligations or to declare a breach or default for such failure to perform.

9. Mortgagee's Powers. At any time and from time to time, without liability and without notice, upon written request of Owner and presentation of this Security Instrument, and without affecting the personal liability of any person for the performance of the Obligations, Mortgagee may: (a) release any part of the Property; (b) consent to the making of any map or plat of the Property; (c) join in granting any easement on the Property; and (d) join in any extension agreement or any agreement subordinating the lien or charge of this Security Instrument.

10. Successors. This Security Instrument applies to, inures to the benefit of, and binds all parties to this Security Instrument, their heirs, legatees, devisees, administrators, executors, and permitted successors and assigns. The terms "**Hometap**" and "**Mortgagee**" will include any successor or assign of Hometap's rights in the Option Agreement and in this Security Instrument, whether or not named as Hometap in this Security Instrument. Absent Mortgagee's prior written consent, which consent may be withheld in its sole discretion, Owner may not assign or otherwise transfer this Security Instrument.

11. Interpretation. In this Security Instrument, whenever the context so requires, the masculine gender includes the feminine and/or the neuter, and the singular number includes the plural. Also, in this Security Instrument, the term "include" or "including" means without limitation by reason of enumeration.

12. Joint and Several Liability. If more than one person signs this Security Instrument as Owner, the obligations of each signatory will be joint and several.

13. Multiple Owners. If there are multiple Owners of the Property:

(a) this Security Instrument must be signed by each Owner;

(b) all rights and powers specified for Owner in this Security Instrument must be approved and exercised unanimously by each Owner;

(c) each Owner will be jointly and severally liable for all liabilities and Obligations;

(d) notice required to be given by, or to, each Owner will be deemed adequately given if given by or to any Owner using the contact information set forth in this Security Instrument; and

(e) Hometap may treat any notice received from any Owner as notice from all Owners.

14. Incorporation by Reference. Exhibit A to this Security Instrument is incorporated by this reference.

15. Extent of Lien. The lien granted under this Security Instrument will encumber Owner's entire interest in the Property, notwithstanding the fact that the Option Agreement relates to only a fractional interest in the Property.

16. No Merger. So long as any of the Obligations remain outstanding and undischarged, unless Hometap otherwise consents in writing, the fee estate of Owner in the Property or any part of the Property (including the estate of Mortgagee after exercising the Option) will not merge, by operation of law or otherwise, with any other estate in the Property or any part of it, but will always remain separate and distinct, notwithstanding the union of the fee estate and such other estate in Mortgagee or in any other person.

17. Release. Following payment of all amounts secured by this Security Instrument, Mortgagee will discharge this Security Instrument.

18. Subordination of Homestead and Waivers. If Owner has acquired before the Signing Date or acquires on or after the Signing Date an estate of homestead in the Property, Owner agrees, to the fullest extent permitted by applicable law, that such homestead estate is subordinated in all respects to this Security Instrument and the amount of any Obligation owed and to all renewals, extensions, and modifications of any Hometap Homeowner Agreement, and that such homestead estate is subject to all of the rights of Mortgagee under the Option Agreement and all renewals, extensions, and modifications of the Option Agreement, and is subordinate to the lien evidenced by this Security Instrument and all renewals, extensions, and modifications of this Security Instrument. Owner waives and relinquishes all rights of curtesy and dower in the Property.

19. Jury Trial Waiver. Mortgagor hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Option Agreement.

20. Notice of Option Purchase Agreement. Mortgagor hereby provides notice that Mortgagor and Mortgagee have entered into the Option Agreement, as more particularly described in Exhibit B attached hereto and incorporated herein by this reference as if set forth in full. The Option Agreement contains certain covenants and promises to or for the benefit of Mortgagee. The Option Agreement is irrevocable by Mortgagor and expires on 08/23/2032. Every person or entity who now or hereafter owns or acquires any right, title or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Option Agreement, whether or not such person or entity expressly assumes such obligations or whether or

not any reference to the Option Agreement is contained in the instrument conveying such interest in the Property to such person or entity.

21. Notices. All notices or other written communications hereunder shall be delivered in accordance with the applicable terms and conditions of the Option Agreement. Notices shall be sent to the address of the other party listed below as follows, unless a party has been notified by the other party in writing of a substitute address:

**Hometap/Mortgagee:**

Hometap Investment Partners III SPV, LLC
800 Boylston Street, 16th Floor
Boston, MA 02199
Attention: Legal Department

**Owner/Mortgagor:**

Leslie Andreula
Dominick Andreula
5344 Moon Shadow Ln
Greenacres, FL 33463

*[Signature Pages Follow]*

**READ THIS DOCUMENT CAREFULLY BEFORE SIGNING IT. ALL PRIOR ORAL, ELECTRONIC, AND WRITTEN COMMUNICATIONS AND AGREEMENTS FROM OR WITH HOMETAP, INCLUDING ALL CORRESPONDENCE, OFFER LETTERS, PRINTED MATERIALS, AND DISCLOSURES ARE MERGED INTO AND SUPERSEDED AND REPLACED BY THIS SECURITY INSTRUMENT, THE OPTION AGREEMENT, AND THE INVESTMENT DOCUMENTS, AND THE OTHER WRITTEN AGREEMENTS MADE BY AND BETWEEN MORTGAGOR AND MORTGAGEE AS OF THE EFFECTIVE DATE.**

**OWNER DECLARES THAT OWNER HAS READ THIS MORTGAGE AND SECURITY AGREEMENT, UNDERSTANDS IT, HAS RECEIVED A COMPLETELY FILLED-IN COPY OF IT WITHOUT CHARGE THEREFOR, AND HAS SIGNED IT AS OF THE SIGNING DATE.**

**The undersigned Owner(s) requests that a copy of any Notice of Default or Notice of Sale under this Security Instrument be mailed to the Owner at the Owner's address set forth in Section 21 above.**

IN WITNESS WHEREOF, each undersigned Mortgagor has executed this Mortgage and Security Agreement under seal as of the Signing Date.

**MORTGAGORS:**

By: ______________________
Leslie Andreula

Date: 8-25-2022

By: ______________________
Dominick Andreula

Date: 8-25-2022

**Acknowledgment Certificate**

State of Florida

County of Palm Beach

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this 25 day of August, 2022, by Leslie Andreula.

JEANNETTE GRENIER
Notary Public - State of Florida
Commission # GG 925339
My Comm. Expires Dec 1, 2023
Bonded through National Notary Assn.

(Notary Seal)

Signature of Notary Public - State of Florida

Jeannette Grenier

Printed Name of Notary

Personally Known ______ OR Produced Identification X

Type of Identification Produced Driver License

**Acknowledgment Certificate**

State of Florida

County of Palm Beach

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this 25 day of August, 2022 by Dominick Andreula.

JEANNETTE GRENIER
Notary Public - State of Florida
Commission # GG 925339
My Comm. Expires Dec 1, 2023
Bonded through National Notary Assn.

(Notary Seal)

Signature of Notary Public - State of Florida

Jeannette Grenier
Printed Name of Notary

Personally Known ______ OR Produced Identification X

Type of Identification Produced Driver License

## EXHIBIT A

## LEGAL DESCRIPTION

Real property described as follows:

All that certain land situate in Palm Beach County, Florida, viz:

Lot 245, Nautica Isles - Plat Three - Replat, according to the map or plat thereof, as recorded in Plat Book 93, Pages 53 through 57, inclusive, of the Public Records of Palm Beach County, Florida.

Parcel ID / APN: 18-42-44-35-16-000-2450

# EXHIBIT B

## NOTICE OF OPTION

This Notice of Option ("**Option Notice**") provides notice of the Option Purchase Agreement entered into as of 08/25/2022 ("**Signing Date**"), by and between Dominick Andreula and Leslie Andreula, husband and wife and Hometap ("**Option Agreement**"), and supplements the Security Instrument of the same date between the parties. Capitalized terms used in this Option Notice shall have the meanings specified herein, or if not defined herein, in the Option Agreement or the Security Instrument.

## RECITALS

A. Mortgagor hereby declares that as of the Signing Date, Mortgagor and Mortgagee have entered into that certain unrecorded Option Agreement, which is hereby incorporated into this Option Notice as if set forth in full, pursuant to which Mortgagor grants and conveys to Mortgagee the option to purchase an undivided percentage interest of fee simple title ownership in and to the Property. In consideration for granting and conveying the Option to Mortgagee, Mortgagee paid to Mortgagor the Investment Amount. The Option is irrevocable by Mortgagor and expires on 08/23/2032.

B. In the Option Agreement, Mortgagor has made certain covenants and promises to, or for the benefit of, Mortgagee in connection with the Option and the Property, all as more particularly described in and on the terms and conditions stated in the Option Agreement.

C. Mortgagor has executed this Option Notice to give notice of the Option Agreement and certain rights and responsibilities of Mortgagor as to the Mortgagee, as well as the covenants and promises set forth in the Option Agreement that run with the land and will be binding upon any party who acquires Mortgagor's interest in the Property, so long as the Option Agreement has not expired or been terminated.

## TERMS

1. <u>Notice</u>. Every person or entity who now or later owns or acquires any right, title, or interest in or to any portion of the Property is and shall be conclusively deemed to have consented and agreed to every restriction, provision, covenant, right, and limitation contained in the Option Agreement and this Option Notice, whether or not such person or entity expressly assumes such restrictions, provisions, covenants, rights, and limitations or whether or not any reference to the Option Agreement or this Option Notice is contained in the instrument conveying such interest in the Property to such person or entity.

2. <u>Covenants</u>. The Option Agreement covenants are deemed to be covenants running with the land, so as to give it the broadest possible application, and include, without limitation:

(a) Restrictions on Mortgagor's right to transfer the Property without giving proper written notice to Mortgagee and requirements that Mortgagor comply with specific sale procedures set forth in the Option Agreement;

(b) Requirements that Mortgagor maintain insurance on the Property against certain hazards and risks;

(c) Restrictions on Mortgagor's ability to increase the amount of debt to third parties secured by liens on the Property as specified in the Option Agreement;

(d) Restrictions on the Mortgagor's ability to rent the Property;

(e) Requirements that Mortgagor keep Property free of liens not approved by Mortgagee; and

(f) Requirements that Mortgagor protect and maintain the Property.

EXHIBIT C

20

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT
CIVIL ACTION
NO. 2584CV00469-BLS2

COMMONWEALTH OF MASSACHUSETTS

vs.

HOMETAP EQUITY PARTNERS, LLC and
HOMETAP MANAGEMENT HOLDINGS, LLC

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

The Commonwealth of Massachusetts has brought five claims of unfair and deceptive acts and practices under G. L. c. 93A, § 2 against Hometap Equity Partners, LLC and Hometap Management Holdings, LLC (together Hometap) in connection with Hometap's product, the Home Equity Investment (HEI). The Commonwealth alleges the HEI is an illegal mortgage loan (Count I), violates the criminal usury statute (Count II), has been marketed deceptively (Count III), was unaccompanied by required state and federal loan disclosures (Count IV), and is an unfair, oppressive or otherwise unconscionable product (Count V). The Commonwealth seeks a declaration that all HEI contracts with Massachusetts consumers are unlawful mortgage loans and subject to the criminal usury statute, a permanent injunction barring further violations of G. L. c. 93A, reformation of the HEIs in the Commonwealth, an order requiring Hometap to pay restitution, and an award of civil penalties and costs.

Hometap moves to dismiss the Complaint pursuant to Mass. R. Civ. P. 12(b)(6). Hometap argues that three of the Commonwealth's counts are based on the incorrect premise that the HEI is a loan when, according to Hometap, the HEI is an option contract (Counts I, II, and IV). As to the remaining counts, Hometap argues the

Notice Sent
3/email
8/21/25
EC

Commonwealth has not alleged facts that plausibly suggest the HEI is unfair or unconscionable (Count V) or that the HEIs have been marketed deceptively (Count III).

After hearing and review, and for the reasons stated below the Motion to Dismiss is DENIED.

## BACKGROUND

I recite the relevant facts asserted in the Complaint, "taking them as true for purposes of evaluating the motion to dismiss." Edwards v. Commonwealth, 477 Mass. 254, 255 (2017). Although, in general, I do not accept as true conclusory allegations or legal conclusions, see Iannacchino v. Ford Motor Co., 451 Mass. 623, 632-633 (2008), because the Commonwealth proceeds in the public interest and pursuant to G. L. c. 93A, § 4, I include a brief description of Massachusetts regulations governing various mortgage products as detailed in the Complaint. Further, I consider and address the exhibits attached to the Complaint. See Polay v. McMahon, 468 Mass. 379, 381 n.3 (2014), and cases cited. Lastly, because the Complaint is lengthy and complex, I provide only an overview of the factual allegations regarding the HEI product and Hometap's conduct. Some facts are reserved for discussion below.

### A. Reverse and Subprime Mortgages

In the 1980s and 1990s a new form of home mortgage, reverse mortgages, began to proliferate. A reverse mortgage is typically marketed to homeowners with equity but insufficient assets to cover expenses. The lender provides cash in exchange for an interest in the homeowner's equity. The borrower makes no monthly payments because the lender recoups its investment through a voluntary or involuntary sale of the home. This differs from a traditional mortgage which the borrower pays monthly and the home serves as collateral for the risk of default. In a traditional mortgage, a homeowner's debt decreases with monthly payments at the same time the homeowner's equity increases. In a reverse mortgage, the homeowner's debt increases

over the life of the loan which is called negative amortization.

Reverse mortgages are almost always non-recourse meaning the lender cannot recover any deficiency from the homeowner if the loan balance exceeds the value of the property. Lenders manage the risk of such non-recourse loans by limiting the size of loans or their duration, or pooling actuarial risk among borrowers.

To protect elderly homeowners, Massachusetts regulations provide that reverse mortgages mature only upon death, default, a sale of the property or when the borrower moves out of the property. In addition, reverse mortgages are limited to owner-occupiers who are over age 60, who receive counseling, and are permitted a seven day rescission period. Reverse mortgages that are federally insured must also comply with federal regulations including limits on the amount of origination fees and closings costs.

In the late 1990s and early 2000s, subprime mortgage lending, another non-traditional form of mortgage, expanded. These mortgage products were marketed nationwide to people with limited access to mainstream loans, often by nonbank entities to avoid oversight. Loans were offered against the value of the home with no regard to or investigation into the borrower's ability to pay the loan. These loans were called "low doc" or "no doc" loans. The mortgages were often sold onto the secondary mortgage market to offload risk. Subprime lenders would also repeatedly refinance loans in short periods of time to generate fees. Subprime loans also often included the following features: negative amortization, interest-only periods, higher rates than disclosed initially, and balloon payments requiring repayment of the principal in a single payment at the end of the loan.

Subprime mortgages led to a mortgage crisis with millions of homeowners unable to pay their mortgages and ultimately losing their homes in a wave of foreclosures. The crisis ultimately led to a nationwide recession.

The Commonwealth enacted regulations to limit subprime loan practices including limiting high cost loans, limiting adjustable-rate subprime loans, allowing borrowers to cure defaults, and permitting borrowers to modify certain loans.

**B. Hometap's HEI**

Hometap, founded in 2018, originates, advertises and markets HEIs in Massachusetts. The Commonwealth alleges that HEIs include four key features: an upfront cash payment without underwriting to assess income, jobs or other assets; acquisition of a percentage interest in the homeowner's equity at two times the value of the cash payment; a return that can and does exceed a twenty percent annual interest rate; and a ten-year balloon payment.

*HEI Structure*. Hometap uses a form Option Purchase Agreement (Option Agreement). It provides that the homeowners sell Hometap an "exclusive and irrevocable option to acquire an undivided percentage interest of a fee simple title ownership" in the borrower's property (Option) in exchange for an "Investment Amount" which is a cash payment less fees and costs, some of which Hometap retains. The percentage equity option in the premises that Hometap holds is two times the amount the Investment Amount (Hometap Percentage).[1] When a homeowner signs the Option Agreement, the value of the Hometap Percentage exceeds the Investment Amount. Thus, as described in the Complaint, with an Investment Amount of $100,000, the homeowner would receive approximately $97,000 and Hometap would hold the option to purchase home equity of $200,000.

The homeowner must repay the Investment Amount (settle) within ten years, or earlier if title is transferred or other events of default occur. The value of Hometap's share in the property (Hometap Share) at settlement is calculated by multiplying the

---

[1] The Commonwealth alleges Hometap does not adequately disclose the 2x delta between the Investment Amount and the Hometap Percentage.

Hometap Percentage by the property's value when the option is exercised, determined by an appraisal. According to the Commonwealth, Hometap's profit is driven by equity devaluation and not home value appreciation because the homeowner must pay Hometap twice the Investment Amount before factoring in appreciation. "Thus, it is Hometap's devaluation of homeowner's equity rather than home appreciation that is truly responsible for Hometap's profit," to the detriment of the homeowner.

The Option Agreement caps the annualized rate of return at twenty percent of the Investment Amount by limiting the total value of the Hometap Share to an amount equal to that annualized rate of return (Hometap Cap). According to the Commonwealth, the Hometap Cap "functions as a compounding interest rate" and is applied against the total Investment Amount, including fees that Hometap retained. Thus, HEIs that settle at the Hometap Cap "uniformly exceed a 20% simple interest rate on the amount advanced."

Hometap protects its "contractual and economic interest in the Option" through a Mortgage and Security Agreement recorded when the Option Agreement is executed. The Mortgage provides that, upon an event of default, Hometap may take possession of the property without any foreclosure action and have the right to sell the property at a nonjudicial foreclosure sale.

Homeowners can settle before the ten-year window. In addition, property values can decline. But even in these scenarios, the homeowner's equity is still devalued – at a rate of 33% rather than 50%. Hometap ensures it will be repaid the Investment Amount because the average home "would need a realized decline of 25% before Hometap would lose its first dollar of principal." Thus, "regardless of what happens to property values, homeowners will pay back vastly more than they receive from Hometap" and Hometap's principal would never be at risk. Included within the Complaint is an analysis of the anticipated repayment amounts and effective interest

rates based on a $100,000 Investment Amount, using various assumptions in the change in home value showing that, even in the worst real estate market, Hometap would earn a six percent return on its Investment Amount. Thus, Hometap is not investing in equity because its investment is never meaningfully at risk.

*Marketing and Sales*. Until at least the spring of 2024, Hometap claimed on its website that it would "invest alongside homeowners" and would do so "without any . . . interest over the life of the investment," which would lead homeowners to believe that only home appreciation drives Hometap's returns. To its investors, however, Hometap, markets the HEI as providing downside protection "even during times of declining home values" and that it includes "an adequate cushion" to minimize potential losses. The cushion is, in fact, equity devaluation which insures Hometap against any risk of loss of its investment. Such advertising would lead an average homeowner to believe that Hometap's investment is equal to its equity option and not twice the value of its investment.

Hometap employs sales representatives who use scripts to explain the HEI to homeowners. At times, these representatives explain to homeowners that Hometap would share in any loss if the property were to depreciate. The representatives also imply they are neutral "guides," not employed to convince the homeowner to take out an HEI when they are, in fact, employed by Hometap to sell HEIs. They also do not explain that the homeowner may be eligible for less costly loans or that the HEI might make it more difficult to refinance in the future. Nor are homeowners provided the actual cost of the HEI – such as by including an Annual Percentage Rate or effective interest in various scenarios – such that homeowners can comparison shop. "The representations in Hometap's Marketing and made by its Investment Managers had, on net, a tendency to obscure the true cost of the Hometap HEI and the reality that the Hometap HEI is dramatically more costly to homeowners than other mainstream

mortgage products or that Hometap's marketing materials and sales scripts communicated."

*Subsequent HEIs.* Hometap offers homeowners an option to pay off the first HEI with a new larger HEI to obtain additional cash, initially called a "double tap" and later an "investment increase." In those circumstances, Hometap charges the homeowner the same fees charged earlier. Changing the name from "double tap" to "investment increase" falsely implies the new HEI is only an increase and thus, the homeowner will not have to pay all the fees and costs. The Commonwealth described a scenario where a homeowner entered into an HEI for $227,950, and less than a year later entered into a second for an additional $29,000. Hometap charged and the homeowner paid nearly $4,000 in fees plus a 23.9% effective interest rate on the first HEI. Hometap, as a result, owned the right to 50% of the value of the homeowner's $1 million home having paid the homeowner only $257,000 after fees.[2] Further, Hometap did not always disclose it would charge additional fees.

*Third Party Costs*. Hometap misleads homeowners in connection with alleged third party costs for appraisals. First, because Hometap refers to the costs as "third-party" costs, the homeowners believe the amount is paid to a third party whereas Hometap retains the vast majority of the fee. Second, although Hometap charges $299 for a virtual appraisal, the appraisal it conducts costs less than $100. The same is true with respect to the $599 Hometap charges for a traditional, physical appraisal – Hometap keeps most of the fee. Hometap thus profits, significantly, from both types of appraisals. Further, Hometap requires a formal appraisal when the HEI is paid off, but not when the HEI is generated. Because physical appraisals result in higher valuations,

[2] The Complaint alleges another homeowner entered into a double tap that resulted in Hometap owning fifty percent of the homeowner's home value even though it paid less than twenty percent of the value.

Hometap receives a higher profit if it does not use the same valuation at the beginning and end of the HEI.

*Renovation Adjustments*. Hometap markets the HEIs as a financing source for renovations and offers a "renovation adjustment" to allay concerns homeowners may have about giving Hometap a percentage of equity prior to a renovation. For renovations of at least $25,000, the renovation adjustment is advertised as an appraiser determined value of the property post renovation compared to an appraisal without the renovation. But Hometap does not disclose that the amount of the adjustment is limited to the lesser of the amount actually spent or the difference. Thus, if a homeowner spent $50,000 on a renovation resulting in $100,000 in increased value the homeowner would be entitled to only the $50,000. The restriction is disclosed only in the lengthy contract which is provided only after the application and underwriting is complete.

*Targeted Homeowners*. "A substantial fraction of Hometap's customers are homeowners facing financial vulnerability such as lack of income, high debts, or high expenses." That is because Hometap markets HEIs' to homeowners who cannot qualify for a traditional loan, retirees, and the unemployed. Hometap also markets to consumers seeking to pay off debt and has persuaded customers to use higher cost HEI's to pay off lower cost unsecured debt. Hometap also markets HEIs' to homeowners who had obtained COVID forbearances without disclosing other, lower cost options.

*Lack of Underwriting*. Hometap does not determine whether a homeowner can repay the HEI using income or assets and makes no assessment of the homeowner's ability to pay taxes, insurance, maintenance expenses, or existing mortgage payments, "even though failure to make these payments" triggers the homeowner's obligation to repay the HEI. The only evaluation Hometap conducts is whether the homeowner can repay the HEI through a sale or refinancing of the property. The lack of assessments

result in the homeowner's ability to get money quickly, and without documentation, and may lead them to choose an HEI over loans that cost less and have safeguards.

Hometap can only provide cash quickly if the HEI product is not governed by the regulations put in place with respect to reverse and subprime mortgages. Thus, in marketing the HEI, Hometap neither insures that it provides money only to homeowners with the ability to repay, as with traditional mortgages, nor complies with the strict regulatory limits on reverse mortgages.

*Structural Unfairness*. A significant percentage of Hometap customers will not be able to afford the purchase repayment when due after ten years through income, assets or a refinancing because their income and credit history will not support a loan large enough to pay off an original mortgage plus the HEI. In that event, Hometap can take joint ownership and exercise its right to foreclose or sell the property.

## DISCUSSION

In evaluating a motion brought under Mass. R. Civ. P. 12(b)(6), I "look beyond the conclusory allegations in the complaint," Curtis v. Herb Chambers I-95 Inc., 458 Mass. 674, 676 (2011), and determine if the plaintiff has pleaded "factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief." Iannacchino, 451 Mass. at 636 (quotations omitted). In doing so, I must accept as true all facts pleaded in the complaint. Edwards, 477 Mass. at 255. I also accept as true "such inferences as may be drawn [from those facts] in the plaintiff's favor." Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). Applying this standard, I conclude that the Commonwealth has alleged sufficient facts to state plausible entitlements to relief on all counts.

### I. Counts I, II, and IV

Counts I, II, and IV all allege violations of G. L. c. 93A based on the illegal provision of unlawful mortgage loans. Count I alleges that HEIs are illegal reverse

mortgage and high-cost mortgage home loans that do not comply with Massachusetts law. Count II alleges the HEIs are usurious loans that violate G. L. c. 271, § 49. And Count IV alleges deceptive marketing related to the provision of loans. Hometap argues that Counts I, II, and IV must be dismissed because they are all based on the incorrect premise that the HEI is a loan.

The parties' respective positions center on whether the HEI is an option or a loan. Hometap argues the HEI is not a loan and not a mortgage loan but an option to acquire a percentage ownership in property in exchange for a cash payment.[3] Hometap argues that options to compel the conveyance of real property are common and generally permissible. No one disagrees. See Certified Corp. v. GTE Prods. Corp., 392 Mass. 821, 824 (1984) ("An option to purchase property which binds the successors and assigns of

---

[3] Hometap asserts that it has offered HEIs in the Commonwealth for years; the Massachusetts Division of Banks (DOB) publicly recognizes that HEIs are critically distinct from loans and has indicated that it does not have the legislative authority to regulate such shared equity products; state legislators have recognized the HEI product is not a loan; and that bills are pending before the legislature that would allow the creation of a regulatory framework for products such as HEIs. Hometap also asserts that prior to offering HEIs in the Commonwealth, Hometap met with both the DOB and the Attorney General's Office (AGO) and neither expressed concern. Thus, the AGO "sat on its hands for years" permitting Hometap to invest significant sums in the Commonwealth prior to determining the product was unfair.

Against that backdrop, Hometap argues that the AGO's pursuit of G. L. 93A claims in this case "short-circuits" and "contravenes" the legislative process and violates Hometap's due process rights. Those issues, however, are not squarely presented before me on the instant motion. And, to the extent I accept Hometap's assertions without converting the motion to one for Summary Judgement, see Mass. R. Civ. P. 12(b), the argument that the AGO is ahead of the DOB or the legislature in taking steps to protect consumers from a product the AGO believes, and alleges is unfair and unconscionable, or has perhaps reached a different conclusion as to the fairness of HEIs after they were offered to Massachusetts consumers is not a basis on which to grant a Motion to Dismiss. Today, I evaluate only whether the Commonwealth has stated claims for relief ultimately subject to judicial review.

each party, and which includes mutual covenants involving the property, creates a contingent equitable interest in the option holder."). With that understanding, Hometap argues the HEIs are options because Hometap pays homeowners for the right to obtain a percentage possessory interest in the homeowner's property in the future upon the occurrence of various contingencies, including the homeowner's failure to repay (settle) the option payment (Investment Amount) within ten years.

The Commonwealth responds that the HEIs are merely disguised loans, and that the nomenclature does not control, because Hometap delivers money with the expectation that it will be repaid via settlement or through a forced sale of the property. See Murphy v. Charlestown Sav. Bank, 380 Mass. 738, 746 (1980) (defining a "loan" as "(d)elivery by one party to and receipt by another party of a sum of money upon agreement, express or implied, to repay it, with or without interest."), quoting Black's Law Dictionary 844 (5th ed. 1979).

Assuming the facts asserted in the Complaint are true, as I must, the Commonwealth has sufficiently alleged that HEIs are, in substance, loans. The Commonwealth alleges that Hometap provides money to homeowners with a requirement that it be repaid and that the HEI structure ensures there is *no substantial risk* that Hometap will lose its principal.[4] The money is either repaid in ten years, with a substantial increase, which the Commonwealth alleges constitutes interest, or Hometap exercises its option and its right to foreclose or force a sale. The Complaint also alleges that Hometap explicitly markets its products to homeowners in need of cash *in the short term* who will, therefore, be unlikely to be able to settle in ten years. And, neither the

[4] Hometap's insistence that the *contract* does not require repayment is simply another way of saying the loan is non-recourse because repayment would be required if the homeowner wished to continue to live in and own the property after ten years. See *infra*.

homeowner nor Hometap anticipate that Hometap will actually retain a possessory interest in the property. Put elsewise, Hometap never intended to be a joint equity owner with any homeowner. Those allegations make the HEI – in substance – more akin to a loan than an option to purchase real estate.[5] See In re J.G. Wentworth Originations, LLC, No. 17-2188-C, 2017 WL 3573537, at *1 (Mass. Super. Aug. 10, 2017) (Gordon, J.) (structured sale of personal injury payments at a 34.2% discount "is in function and economic substance—if not nominally in form—a loan" subject to usury law).

That the HEIs are non-recourse does not necessarily mean they are not loans as a matter of law. See In re Stone St. Cap., LLC, No. NOCV2012-01891, 2013 WL 3341052, at *3 (Mass. Super. May 10, 2013) (Salinger, J.) ("A loan of money made on a non-recourse basis – meaning that the borrower is not liable for repaying the lender and that the lender instead must rely on some collateral, other assets, or third-party obligation – is still a loan."), citing Commissioner of Internal Revenue v. Tufts, 461 U.S. 300, 313 (1983) ("a nonrecourse loan should be treated as a true loan" for purposes of applying Internal Revenue Code). See also G. L. c. 167E, § 7(h) (defining "non-recourse reverse mortgage loan" as "a reverse mortgage loan which limits the lender's recovery solely to the value of the property at the time the loan becomes due and payable").

Nor does labelling the transaction and operative agreement as an "option" control. It is the substance of the transaction that governs not the labels. See Singhal v. Unison Agreement Corp., No. 22-60656-CIV, 2023 WL 2734230, at *5 (S.D. Fla. Mar. 31, 2023) ("The law is clear that the substance of the transaction rather than the form is

---

[5] The possibility that Hometap may recover less than its investment amount may be provable. But on a Rule 12(b)(6) motion I must accept as true the Commonwealth's factual allegations that the equity devaluation inherent in the HEI's structure makes that possibility illusory because the property would have to decrease by more than 25% for that eventuality to occur.

examined to determine whether the transaction should be considered a loan."). Indeed, more than a century ago, the Supreme Judicial Court (SJC) considered whether the transaction at issue – nominally a real estate purchase with an option to repurchase – was a real purchase or a "conveyance received by the defendants as security for a loan made by them to the plaintiff[.]" Southwick v. Bigelow, 237 Mass. 299, 304 (1921). Based on a master's factual findings that the parties "contemplated the payment within a year of the $12,000 advanced by the defendants, and that the deed and agreement were given as security therefor," the SJC held the purported sale was "not one in reality." Id. at 305. Rather, the transaction constituted a loan with a mortgage. Id. Thus, Southwick teaches two things – the substance and not the form controls – and the determination of the true nature of a transaction like the one at issue here is a question of fact. Id. Accord Eastman Marble Co. v. Vermont Marble Co., 236 Mass. 138, 152-153 (1920) (option to purchase real estate does not create an interest in real estate).

The Commonwealth also is correct that a typical option to purchase real estate involves the payment of consideration for the option itself and then the payment of the agreed-upon purchase price if the option is exercised. See, e.g., Thacher v. Weston, 197 Mass. 143, 146 (1908) (option contract provided that, in consideration of $25, plaintiff held option to purchase real property for $10,000); FBT Everett Realty, LLC v. Massachusetts Gaming Comm'n, No. 1881CV00304-B, 2021 WL 2584131, at *2 (Mass. Super. June 16, 2021) (Salinger, J.), aff'd in part, rev'd in part on other grounds, 489 Mass. 702 (2022) (option contract for land on which to build a casino included monthly payments of $100,000 "in exchange for acquiring and maintaining the right, but not any obligation, to buy the property for $75 million" if option holder was awarded a casino license) Here, the Commonwealth alleges that all the value for the percentage possessory interest in the real property is paid as consideration for the alleged option and not when the option is exercised. As noted, it also alleges that the mortgage does

not secure the option, as Hometap argues, but repayment because Hometap "has no intention of becoming a joint owner" of any homeowner's property. Those alleged facts would support a conclusion that the arrangement is not a true option but a loan.

At the end of the day, the Commonwealth's allegations, if true – that Hometap pays money to homeowners who are subject to foreclosure and a forced sale if they fail to repay Hometap approximately two times Hometap's investment – would support the conclusion that the transaction at issue is not an option but a loan. At this stage of the litigation, it is premature to conclude one way or the other, but the Commonwealth has alleged facts which plausibly suggest the HEIs are loans and thus violate G. L. c. 93A because they are illegal mortgage loans (Count I), violate the criminal usury statute (Count II), and violate required state and federal loan disclosures (Count IV).

Hometap's other arguments are not persuasive at this stage of the litigation. First, Hometap relies on In re Yang, No. 23-00075-RLM-11, 2023 WL 7104764, at *1 (Bankr. S.D. Ind. Oct. 23, 2023) for the proposition that a "home equity sharing agreement" in which a company paid cash to acquire an option for a future interest in real property was an option contract. Again, there is no dispute that real estate option contracts can be valid. Indeed, In re Yang involved a more traditional option contract, as discussed above, where the company paid "paid $54,250.00 for the future right to purchase a 70.00% interest in the property for *an additional payment of* $157,325.00." Id. (emphasis added). There, unlike here, most of the consideration for the acquisition of the property interest (three times the option amount) was paid upon exercise of the option.

Hometap argues next that its return on investment is not interest because it is not a charge calculated as a product of principal, interest, and length of loan. But additional compensation to a lender need not be calculated in any particular way to constitute interest. "The word interest in its usual sense is the compensation fixed by the parties

or allowed by law for the use of money or as damages for its detention." Begelfer v. Najarian, 381 Mass. 177, 181 (1980), citing Hayes v. Commissioner of Corps. & Taxation, 261 Mass. 134, 136 (1927). See G. L. c. 271, § 49(a) (defining "interest or expenses" for purposes of criminal usury to include "all sums paid or to be paid by or on behalf of the borrower for interest, brokerage, recording fees, commissions, services, extension of loan, forbearance to enforce payment, and all other sums charged against or paid or to be paid by the borrower for making or securing directly or indirectly the loan").

Next, Hometap's reliance on Foster v. Equitykey Real Est. Invs. L.P., No. 17-CV-00067-HRL, 2017 WL 1862527, at *4 (N.D. Cal. May 9, 2017) does not require dismissal. The option at issue there was a payment of "$196,000 to purchase the option to participate, at a rate of 100%, in the appreciation of the property, if any, from its initial value of $1,200,000." Id. at *3. While recognizing that the intent of the parties is "an important factor in determining whether a loan was created," the court held the payment was not a loan but an option because there was "no guarantee that the payment received by Mr. Foster need ever be returned." Id. at *4. The differences are clear. In Foster, return of any portion of the money was entirely contingent on an increase the property appreciating in value. Here, the Commonwealth has alleged that the HEI's structure ensures a return to Hometap regardless of home appreciation because of the functional equity devaluation. For the same reason, Hometap's reliance on the comments to 12 Code. Fed. Regs. Part 1026 does not persuade me that dismissal is appropriate. Those comments note that the Federal Truth in Lending Act (TILA) does not apply to option contracts in which the party advancing money to a homeowner risks the loss of the capital advance. See 12 Code Fed. Regs. § 226, Supplement I, Subpart A, 2(a)(14)(vii) (TILA does not apply to "[t]he execution of option contracts" and "[i]nvestment plans in which the party extending capital to the consumer risks the loss of the capital advanced."). Here, as oft noted already, the Commonwealth alleges

*as a matter of fact* that Hometap risks no such loss. The truth of that assertion will be tested in this case but is sufficient to avoid dismissal.

Finally, Hometap argues that Count I must be dismissed because the Commonwealth alleges both that the HEI is an unlawful reverse mortgage that fails to comply with G. L. c. 167E, §§ 7, 7A, and a "high cost mortgage loan" as defined by G. L. c. 183C, § 2, and "no product can be both a reverse mortgage and a high cost home mortgage loan." The Commonwealth responds that it has alleged facts which would support the conclusion that HEIs are unlawful reverse mortgages. I agree. The Commonwealth alleges that the HEI is a non-recourse cash payment, secured by a mortgage, and any shared appreciation, principal, or interest are due only upon certain circumstances or at the end of a fixed term and that Hometap did not comply with the regulations governing such loans. (See Com. Mem. at 12-13). The Commonwealth also responds that it has alleged that the HEI is a high cost loan under G. L. c. 183C, § 2. I agree as well.[6] Based on the facts in the Complaint, the Commonwealth has alleged a loan secured by a homeowner's principal dwelling with an annual percentage rate that will exceed nine percent.

For all the above reasons, the Motion to Dismiss Counts I, II, and IV must be **<u>DENIED</u>**.

## II. <u>Count III</u>

Count III alleges deceptive marketing in connection with the HEI. The Commonwealth alleges that Hometap's marketing and sales communications would lead consumer to believe that Hometap's returns stem from the Hometap fee and from

[6] A plaintiff may plead alternative and overlapping theories of liability and any redundancy, if it exists, is more appropriately addressed on a full record via a motion in limine or pursuant to Rule 56. See <u>Massachusetts Port Auth.</u> v. <u>Turo, Inc.</u>, No. 1984CV01773BLS1, 2020 WL 2617169, at *4 (Mass. Super. Apr. 14, 2020) (Green, J.).

home price appreciation when, in actuality, Hometap's return comes from devaluing the homeowner's equity and purchasing it at below market value. In support of its motion, Hometap argues that the Hometap marketing graphic included in the Complaint discloses all the facts from which a reasonable consumer could understand that, at settlement, for a $100,000 payment, Hometap would be entitled to fifteen to twenty percent of the home's value which, in the footnote, is disclosed as home worth $1 million. Further, Hometap argues that the Option Agreement and Investment Term Sheet fully disclose the structure of the HEI and explain in detail how the Hometap Share would be calculated. As a matter of law, then, Hometap argues the marketing could not be deceptive.

This is a closer question. Homeowners are entitled to enter contracts of their choosing – so long as statutorily and regulatorily compliant – and are assumed to have read and understood the contracts and other material provided to them. However, marketing is deceptive if it "directly, *or by implication*, or by failure to adequately disclose additional relevant information, has the capacity *or tendency* or effect of deceiving buyers or prospective buyers in any material respect." 940 Code Mass. Regs. § 3.05(1) (emphasis added). Thus, advertising need not be "totally false in order to be deemed deceptive in the context of G. L. c. 93A. . . . The criticized advertising may consist of a half-truth, or even may be true as a literal matter, but still create an *over-all misleading impression* through failure to disclose material information." Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 320 (2018), quoting Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394-395 (2004) (emphasis added). Here, the ultimate price of the HEI is certainly material, and the Commonwealth has alleged that Hometap's marketing would mislead an objective homeowner as to the ultimate price he or she would have to pay or face foreclosure or a forced sale. Hometap argues that the Commonwealth's other alleged misleading material – related to third party costs,

successive HEIs, and the renovation adjustment – are insufficient either because the disclosures or lack of disclosures were not material or because all were disclosed.

After careful review of the Complaint, the questions of deception and causation are ones that must be developed in discovery, as the "analysis of what constitutes an unfair or deceptive act or practice requires a case-by-case analysis . . . and is neither dependent on traditional concepts nor limited by preexisting rights or remedies." Exxon Mobil Corp., 479 Mass. at 316, citing Kattar v. Demoulas, 433 Mass. 1, 14 (2000), and Travis v. McDonald, 397 Mass. 230, 232 (1986). See Nei v. Burley, 388 Mass. 307, 313 (1983) ("This flexible set of guidelines as to what should be considered lawful or unlawful under c. 93A suggests that the Legislature intended the terms 'unfair and deceptive' to grow and change with the times.").[7]

For all the above reasons, the Motion to Dismiss Count III must be **DENIED**.

**III. Count V**

Count V alleges that the HEI is an unfair, oppressive or otherwise unconscionable product. The claim is based primarily on the structure, as described above, and the allegation that Hometap markets to financially vulnerable consumers who are in debt and cannot qualify for traditional loans, without any investigation regarding whether those homeowners can settle the HEI. The Commonwealth asserts that conduct – whether or not an HEI is a loan – falls within the penumbra of unfairness protected by Chapter 93A.

[7] With respect to the allegations concerning Hometap's sales representatives, although puffery and statements of opinion will not support a G. L. 93A claim, see von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 497 (2019), the Commonwealth has alleged more than mere puffery, including failures to disclose meaningful information. Reliance and causation must await resolution at a later stage.

Hometap argues that the Commonwealth cannot rely on mortgage lending regulations or the usury statute to allege unfairness because the HEIs cannot and should not be measured against regulations that govern loans. According to Hometap, it is not "logical to hold an equity product to the cost limitations of debt products because equity costs more than debt in the market because the equity investor takes on more risk" and "applying the usury limitation to an equity-based product is novel." (Hometap Mem. at 16). I am not persuaded.

Chapter 93A, although more than a half a century old at this point, remains "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 822 (2014), quoting Slaney v. Westwood Auto, Inc., 366 Mass. 688, 693 (1975). Further, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law." H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (quotations and citations omitted). "To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses' " Columbia Plaza Assocs. v. Ne. Univ., 493 Mass. 570, 587 (2024), quoting, H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 14 (2022).

It is not *inappropriate* to measure the HEI against statutes and regulations protecting homeowner mortgagees or other consumer borrowers. In Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 742 (2008), the Court rejected the argument that the defendant did not violate any established concept of unfairness when it originated its

loans because "new rules or standards for defining what is unfair" could not be applied retroactively. The Court reiterated that Chapter 93A "creates *new* substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute," and that the concept of unfairness is not frozen in time because "[t]here is no limit to human inventiveness in this field.' " Id., quoting Kattar v. Demoulas, 433 Mass. 1, 13 (2000). Given G. L. c. 93A's flexibility, "[w]hat is significant is the particular circumstances and context in which the term is applied." Fremont, 452 Mass. at 743.

Here, Hometap concedes that it created a new option for homeowners seeking to access their home's equity. It also concedes that the product is currently unregulated.[8] Therefore, it is not impermissible when considering whether the HEI is unfair or oppressive to consider the guardrails that are in place to protect homeowners who seek to access their equity through traditional or reverse mortgages, as well as the harms those provisions seek to prevent and remedy.

The Commonwealth alleges that the HEI is unconscionably expensive because it provides Hometap a right to a home equity share worth more than twice what it paid the homeowner.[9] It alleges HEI features akin to those found to violate G. L. 93A in Fremont namely the failure to consider the homeowner's ability to repay or settle without losing their home, a balloon payment after ten years, and deliberate marketing to individuals with high debt and low credit, which make it highly likely that

[8] That bills may be "pending" is of no import in connection with a motion to dismiss for failure to state a claim.

[9] I do not view this argument as an attempt to amend the complaint where the factual allegations regarding the alleged excessive cost of the product are contained within the Complaint.

homeowners were/are doomed to "default" at the ten-year term.[10] Cf. Fremont, 452 Mass. at 743. Characterized as debt or equity, the Commonwealth alleges that Hometap enters into contracts with homeowners knowing that the homeowners will not be able to satisfy their obligation to "settle" up with Hometap and will, therefore, lose their homes. Cf. Drakopoulos v. U.S. Bank Nat. Ass'n, 465 Mass. 775, 786 (2013) (Chapter 93A "prohibits the origination of a home mortgage loan that the lender should recognize at the outset [ ] the borrower is not likely to be able to repay"). Those allegations support the claim that the HEI violates Chapter 93A.

Finally, whether the AGO will establish a right to recover penalties, costs or attorney's fees by establishing that Hometap knew or should have known that the HEI violated G. L. c. 93A cannot be decided at this stage.

**ORDER**

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint is **DENIED**.

Debra A. Squires-Lee
Justice of the Superior Court

August 21, 2025

[10] It is immaterial that some of Hometap's customers had better credit ratings or sought funds for purposes other than to pay off high interest, unsecured consumer debt.

hometap

EXHIBIT D

**Hometap Owner Repurchase**
**Settlement Statement**

February 5, 2026

Leslie Andreula and Dominick Andreula
5344 Moon Shadow Ln.
Greenacres, FL 33463

Re: Hometap Investment FL294959

Dear Leslie Andreula and Dominick Andreula,

Thank you for your request to settle your Hometap Investment through an Owner Repurchase of the Option (or, as we call it, a settlement). Here are the specifics:

**Settlement Date: February 5, 2026**
**Settlement Amount: $89,956.19**

**If we receive funds after the Settlement Date above, an additional payment will be due. To determine the correct amount, you can refer to the Settlement Amount Table on page two.**

To make your payment, please use a wire transfer — you can find all of the instructions on how to do this in the second attachment to this email. Once we receive your full payment and receipt of funds, we'll be able to release our lien on your property. In the event a settlement check is used, please understand this may cause delays in processing times.

You're welcome to use a title or escrow service for this settlement, but if you do, it's important to note that you'll be responsible for arranging it.
We're so grateful we had the opportunity to work with you, and hope your Investment was able to help you achieve your financial goals. Thank you for choosing to work with us!

Best,
Your Hometap Investment Support Team

**Please feel free to contact us at homeowners@hometap.com with any questions or concerns.**
**Home Office: 1-617-399-0624**
**Investment Support Direct Line: 1-617-604-6985**

hometap

**Owner Repurchase Amount**
**Settlement Amount**

| Date | Amount |
|---|---|
| February 5, 2026 | $89,956.19 |
| February 6, 2026 | $89,956.19 |
| February 7, 2026 | $89,956.19 |
| February 8, 2026 | $89,956.19 |
| February 9, 2026 | $89,956.19 |
| February 10, 2026 | $89,956.19 |
| February 11, 2026 | $89,956.19 |
| February 12, 2026 | $89,956.19 |
| February 13, 2026 | $89,956.19 |
| February 14, 2026 | $89,956.19 |
| February 15, 2026 | $89,956.19 |
| February 16, 2026 | $89,956.19 |
| February 17, 2026 | $89,956.19 |
| February 18, 2026 | $89,956.19 |
| February 19, 2026 | $89,956.19 |
| February 20, 2026 | $89,956.19 |
| February 21, 2026 | $89,956.19 |
| February 22, 2026 | $89,956.19 |
| February 23, 2026 | $89,956.19 |
| February 24, 2026 | $89,956.19 |
| February 25, 2026 | $89,956.19 |
| February 26, 2026 | $89,956.19 |
| February 27, 2026 | $89,956.19 |
| February 28, 2026 | $89,956.19 |
| March 1, 2026 | $89,956.19 |
| March 2, 2026 | $89,956.19 |
| March 3, 2026 | $89,956.19 |
| March 4, 2026 | $89,956.19 |
| March 5, 2026 | $89,956.19 |
| March 6, 2026 | $89,956.19 |

**For amounts due after dates included on this table, please contact homeowners@hometap.com for an updated statement.**

hometap

## ADDITIONAL INFORMATION

- The terms of your Hometap Option Purchase Agreement, including all representations and warranties, remain in full force and effect until Hometap has received the required Owner Repurchase settlement amount.

- The settlement amount is only valid for a home value of $525,353.00.

- Note: You've elected to repurchase the Option from Hometap. Hometap will have no right to exercise its Option and purchase an ownership interest in the property while a sale of the property is pending, so long as you comply with the terms of the Option Purchase Agreement.

- When we receive the funds, Hometap will release all liens associated with the Hometap Investment, including:
    1. The Mortgage and Security Agreement or Deed of Trust will be satisfied.
    2. The Memorandum of Option Purchase Agreement will be terminated.
    3. The UCC Financing Statement will be terminated.
- Any delay in receiving the settlement funds may cause a delay in releasing the liens associated with the Hometap Investment.

- If another party needs copies of the releases, such as a bank or lender, we ask that you provide us with notice of at least five business days in order to gather the documentation necessary to settle the Investment, including Termination of Option, Satisfaction of Mortgage, and Termination of UCC.

- Please send your request and any questions to homeowners@hometap.com. As a reminder, Hometap's business hours are Monday through Friday, 9am – 5pm EST.

hometap

**Wire Instructions**

**PLEASE NOTE: FUNDS MUST BE SENT BY WIRE**

***Please include Investment ID in the wire transfer memo/reference field***

Funds should be wired to:

WSFS Bank
409 Silverside Road, Suite 100
Wilmington, DE 19809
Routing Number: [redacted]
Beneficiary Name: WSFS Institutional Services
Beneficiary Acct # [redacted]
For Further Credit to: CH136408-1 HTAP BORROWER TR IIA2 COLL ACCT

For Further Credit To information must be included in order for your wire to be received. Failure to include For Further Credit To information will result in significant delays in settling your investment.

**Check Instructions**

**PLEASE NOTE: PAYMENTS RECEIVED BY WIRE WILL BE PROCESSED MORE TIMELY THAN CHECK PAYMENTS.**

***Please include Investment ID in the memo line of the check***

Payment address:
HOMETAP INVESTMENT PARTNERS III L.P
PO Box 202009
Dallas, TX 75320-2009

Payment address only for overnight deliveries by courier:
Lockbox Services 202009
HOMETAP INVESTMENT PARTNERS III L.P
2975 Regent Blvd, Suite 100
Irving, TX 75063

EXHIBIT
E

**Ken A. Escamilla**

**Subject:** FW: Important notice regarding your home equity investment.

---------- Forwarded message ---------
From: **Hometap** <hello@hometap.com>
Date: Mon, Jul 27, 2026 at 10:19 AM
Subject: Important notice regarding your home equity investment.
To: Leslie Andreula <b[redacted]i@gmail.com>

Hi Leslie, Effective 8/3/26, the servicing of your home equity investment is being transferred to Hometap Homeownership Solutions, LLC, a subsidiary of Hometap Equity Partners, LLC.

hometap

Hi Leslie,

**Effective 8/3/26, the servicing of your home equity investment is being transferred to Hometap Homeownership Solutions, LLC, a subsidiary of Hometap Equity Partners, LLC.**

**What this means for you:**

This change has no impact on the terms of your home equity investment or how you contact and interact with Hometap. Specifically:

- The terms and conditions of your Investment (such as pricing and term length) remain the same
- You will continue to access your account through your Hometap portal at www.hometap.com
- You may still contact Hometap at homeowners@hometap.com with any questions on your investment
- Written communications may come from Hometap Homeownership Solutions, LLC
- Any ongoing communications with Hometap's Investment Support team, such as email or text messages, will not be interrupted or impacted

No action is required on your part, but if you have questions about this notice, feel free to contact our Investment Support team at homeowners@hometap.com or 855-223-3144.

Thank you for being a Hometap homeowner. We're proud to help you get more out of homeownership.

Until next time,
The Hometap Team

Check out our **7,333** reviews

★ Trustpilot

Check out our **7,333** reviews

★ Trustpilot

**hometap**

© 2026 Hometap Homeownership Solutions, LLC dba Hometap,
NMLS ID# 2819930 **NMLS Consumer Access** All Rights Reserved
**361 Newbury St, 5th Floor, Boston, MA 02115**

**Contact** • **Privacy Policy** • **Unsubscribe**